2013 CO 5

### The FEDERAL DEPOSIT INSURANCE CORPORATION, in its Capacity as Receiver, Petitioner

v.

### Yale A. FISHER, Respondent.

### No. 10SC762.

Supreme Court of Colorado, En Banc.

Jan. 22, 2013.

Jeffery O. McAnallen, Devi C. Yorty, Steven R. Rider, James T. Markus, Markus

Williams Young & Zimmerman LLC, Denver, Colorado, Attorneys for Petitioner.

Philip W. Bledsoe, Bennett L. Cohen, Polsinelli Shughart, PC, Denver, Colorado, Attorneys for Respondent.

Justice RICE delivered the Opinion of the Court.

¶ 1 We granted certiorari to determine whether the court of appeals erred in holding that section 38–10–124(2), C.R.S. (2012) (Colorado's Credit Agreement Statute of Frauds, or "CASOF"), allows the introduction of extrinsic evidence to interpret an allegedly ambiguous contract. We reverse the court of appeals and conclude that the contract at issue is not ambiguous. Because we hold that the contract is not ambiguous, we do not reach the question of whether CASOF allows for the introduction of extrinsic evidence to resolve a facially ambiguous credit agreement.

## I.   Facts and Proceedings Below

¶ 2 In May 2000, Yale Fisher ("Fisher")—a developer and former bank executive—borrowed $3.42 million from Community Banks [1] to construct a custom home in Cherry Hills Village, Colorado (the "Stanford home"). Fisher secured the loan with the Stanford home and with his $2.44 million vacation property in Telluride, Colorado. The original term of the loan was 15 months. Fisher sought and obtained three extensions on the maturation date of the loan. Each extension was memorialized with a Change in Terms agreement. The interest rate upon default in the Second and Third Change in Terms agreements is at issue in this appeal. The First Change in Terms agreement (the "First Extension") set the default interest rate at the six percent interest rate that governed the entire credit agreement.

¶ 3 The Second Change in Terms agreement, dated February 18, 2002, (the "Second Extension"), extended the maturation date on Fisher's loan until May 18, 2002. The Second Extension included a "description of change in terms" clause noting the revised

---

1. Community Banks has been placed in receivership by the FDIC; the FDIC represents Community Banks' interest in this appeal.

maturation date on the loan and a change in the controlling interest rate. This provision also stated that "[a]ll other terms and conditions remain the same." In fact, other terms and conditions had changed. For example, the number of interest only payments decreased from five to two; the cure period was reduced; and, the default interest rate was changed from the variable interest rate governing the entire document to 36 percent. Fisher signed the Second Extension confirming that he "read and understood all provisions of" the agreement. As the May 18, 2002, maturation date from the Second Extension approached, Fisher sought and obtained another extension, the Third Change in Terms agreement (the "Third Extension").

¶ 4 The Third Extension also contained a "description of change in terms" that failed to encompass all of the changed terms. The description only identified the deferred maturation date on the loan, to May 18, 2003, and the modified controlling interest rate of six percent; it did not mention any of the other numerous substantive changes. These included: an increase in the loan amount; a modified payment schedule; a new late payment schedule whereby Fisher was deemed late 11, rather than 15 days, after payment was due and charging five percent interest on the balance; a new paragraph describing "Events Affecting Guarantor"; and, a reduction in the cure period from 60 to 30 days. The Third Extension also included the 36 percent default interest rate, originally included in the Second Extension. Fisher signed the Third Extension acknowledging that he had read and understood all of its terms and provisions.

¶ 5 Fisher then defaulted on the loan. Community Banks demanded payment and initiated foreclosure proceedings on both the Stanford home and on Fisher's Telluride vacation property. Shortly thereafter, Community Banks sold Fisher's loan to Western Real Estate Equities, LLC ("Western").

¶ 6 Fisher sued Community Banks in Arapahoe County District Court alleging breach of contract, fraud, civil conspiracy, and breach of implied duty of good faith and fair dealing. Community Banks counterclaimed for fraudulent inducement, claiming that Fisher misrepresented his financial situation to obtain the loan. In an Order on Community Banks' Motion in Limine, the trial court ruled that the Third Extension unambiguously established a 36 percent default interest rate and, citing CASOF, excluded much of Fisher's evidence that purported to contradict this interest rate. Based on its CASOF ruling, the trial court dismissed Fisher's fraud and misrepresentation claims as the evidence supporting these claims was precluded by CASOF. Fisher's civil conspiracy and breach of the implied covenant of good faith and fair dealing claims, and Community Banks' fraudulent inducement counterclaim then went to the jury. The jury rendered a verdict in favor of Community Banks on its fraudulent inducement counterclaim, and against Fisher on all of his claims. The trial court entered judgment against Fisher for $136,000.

¶ 7 Fisher appealed the verdict to the court of appeals. In a unanimous, published opinion, the court of appeals reversed and remanded for a new trial. *Fisher v. Cmty. Banks of Colo., Inc.*, — P.3d —, — (Colo.App.2010) (selected for official publication). The court of appeals held that the Second and Third Extensions are facially ambiguous because the 36 percent default interest rate in those Extensions is not described in the Second Extension's "description of change in terms" and therefore conflicts with the default interest rate in the First Extension. *See id.* at — – —. Based on that holding, the court of appeals remanded the case for a new trial and held that CASOF did "not limit extrinsic evidence to resolve facially ambiguous credit agreements." *Id.* at —. The court of appeals also reversed the judgment against Fisher, holding that Community Banks lacked standing to bring the fraudulent inducement counterclaim. *Id.* at —.

¶ 8 Community Banks petitioned this Court for certiorari review. We granted certiorari to determine whether the court of appeals erred in holding that section 38–10–124(2), allowed the introduction of extrinsic evidence to interpret an allegedly ambiguous contract. Now, upon de novo review, we reverse the court of appeals' holding that the

Second and Third Extensions were ambiguous.

## II. Standard of Review

■ ¶ 9 The interpretation of a contract is a question of law. Accordingly, our review is de novo. *Ad Two, Inc. v. City & Cnty. of Denver*, 9 P.3d 373, 376 (Colo.2000) ("[C]ontract interpretation is a question of law that is reviewed de novo and we need not defer to a lower tribunal's interpretation of the contract." (citation omitted)).

## III. The Default Interest Rate is Not Ambiguous

■ ¶ 10 The court of appeals held that the Second and Third Extensions are ambiguous with respect to the default interest rate because the new interest rate is not described in either Extension's "description of change in terms." *Fisher*, —— P.3d at ——. It determined that, because the "description of change in terms" does not address the new 36 percent default interest rate, the clause creates an internal contradiction and the resulting contract is ambiguous. *See id.* We disagree.

■ ¶ 11 Applying rules of contract interpretation, we hold that the contract, as memorialized in the Third Extension,[2] unambiguously establishes a 36 percent default interest rate. This extension contains a heading in capital letters addressing "INTEREST AFTER DEFAULT." It recites that "Upon default, including failure to pay upon final maturity, lender at its option, may, if permitted under applicable law, increase the interest rate on this agreement to 36 percent per annum. The interest rate will not exceed the maximum rate permitted by applicable law." As the three extensions

demonstrate, Fisher is a sophisticated person who had bargaining power and negotiated a series of loan extensions calculated to stave off foreclosure. Our primary aim in contract interpretation is to ascertain and implement the intent of the parties. *Ad Two, Inc.*, 9 P.3d at 376. Moreover, "[t]he meaning of a contract is found by examination of the entire instrument and not by viewing clauses or phrases in isolation." *U.S. Fid. & Guar. Co. v. Budget Rent–A–Car Sys., Inc.*, 842 P.2d 208, 213 (Colo.1992) (citation omitted). Considering, then, the entire Third Extension, without giving undue weight to the isolated phrase "description of change in terms," the 36 percent default interest rate controls. *See id.* ("Each *word* in an instrument is to be given meaning if at all possible." (citation omitted)).

■ ¶ 12 Further, this Court reviews the Third Extension "in its entirety with the end in view of seeking to harmonize and to give effect to all provisions so that none will be rendered meaningless." *Copper Mountain, Inc. v. Indus. Sys., Inc.*, 208 P.3d 692, 697 (Colo.2009) (citation and internal quotation marks omitted); *See Preserve at the Fort, Ltd. v. Prudential Huntoon Paige Assocs.*, 129 P.3d 1015, 1017 (Colo.App.2004) ("To determine the intent of the parties, we view the contract in its entirety."). If every word in the Third Extension is to be given meaning, the description of change in terms alone cannot override the numerous, substantial changes in the instrument. *See Copper Mountain, Inc.*, 208 P.3d at 697; *see also U.S. Fid. & Guar. Co.*, 842 P.2d at 213. Finally, the fact that the parties differ in their understanding of the agreement does not create an ambiguity. *Fibreglas Fabricators, Inc. v. Kylberg*, 799 P.2d 371, 374 (Colo.

**2.** In signing the Third Extension, the parties manifested their mutual assent to the new loan terms and both gave valid consideration; therefore, the Third Extension is the controlling iteration of the contract for purposes of this Court's analysis. *See Indus. Prods. Int'l, Inc. v. Emo Trans, Inc.*, 962 P.2d 983, 988 (Colo.App.1997) ("An enforceable contract requires mutual assent to an exchange, between competent parties, with regard to a certain subject matter, for legal consideration." (citation omitted)). To the extent the court of appeals found ambiguity by considering a conflict between the First, Second, and

Third Extensions, this was inconsistent with a fundamental rule of contract interpretation that the latest iteration of contractual terms controls. *See, e.g., Simon v. Shelter Gen. Ins. Co.*, 842 P.2d 236, 241 (Colo.1992) (describing an exception to "the general rule [ ] that ... the last expression of intent of the contracting parties, [usually] prevail[s] over other inconsistent provisions"); *State Farm Mut. Auto. Ins. Co. v. Graham*, 860 P.2d 566, 568 (Colo.App.1993) ("The endorsement was agreed to by the parties subsequent to the original policy. Its terms therefore prevail to the extent that the two conflict." (citation omitted)).

1990). Ultimately, then, Fisher's subjective understanding of the agreement does not create an ambiguity. *See id.*

¶ 13 Applying these standard rules of contract interpretation shows that the credit agreement between Fisher and Community Banks is not ambiguous as a matter of law. Accordingly, we reverse the court of appeals' conclusion that the contract was ambiguous. Because we hold that the contract is not ambiguous, we reserve for another day the question of whether a party may introduce extrinsic evidence to interpret an ambiguous credit agreement under CASOF.[3]

## IV. Conclusion

¶ 14 We hold that the contract unambiguously establishes a 36 percent default interest rate. Therefore, we do not address whether CASOF permits the admission of extrinsic evidence to resolve a facially ambiguous contract. Accordingly, we reverse the court of appeals and remand for further proceedings consistent with this opinion.

Justice EID concurs in the judgment only.

Justice COATS dissents.

Justice EID, concurring in the judgment.

¶ 15 I agree with the majority that Fisher's fraud and contractual good faith and fair dealing claims fail, but reach that conclusion on grounds other than those cited by the majority. I therefore concur only in the result it reaches.

¶ 16 The majority concludes that it need not reach the question of whether CASOF bars the extrinsic evidence offered by Fisher to support his claims [1] because the contract at issue here unambiguously adopts a 36

percent default interest rate, and therefore the extrinsic evidence would be barred under general principles of contract interpretation. Maj. op. ¶ 11. The majority does not cite authority in this regard, but presumably it is relying on the general notion that extrinsic evidence is not admissible to contradict unambiguous contractual terms. But fraud is an exception to that rule. *See, e.g., Tr. Co. v. Bresnahan,* 119 Colo. 311, 317, 203 P.2d 499, 502 (1949) ("[T]he general rule is that parol evidence to establish fraud between the parties to the instrument is admissible as an exception to the general rule against the admission of parol evidence to vary a written contract."); *Brody v. Bock,* 897 P.2d 769, 775 (Colo.1995) (observing that the "succession statute, like the statute of frauds, must not be allowed to shield the commission of fraud"). Thus, the general rule upon which the majority relies would not apply here even if, as the majority concludes, the contract in this case were unambiguous. But Fisher's claims fail for other reasons.

¶ 17 As the trial court found, the primary "essence" of Fisher's fraud claim is that Community Banks fraudulently and "surreptitiously" inserted the 36 percent default interest rate into the Second and Third Extensions without his knowledge. Before this Court, however, Fisher concedes that the evidence shows that the 36 percent default rate was mistakenly inserted into the agreements by a software error. Therefore, the insertion of the software error amounted to a scrivener's error or mutual mistake. But a claim of fraud requires an intentional and knowing misrepresentation or omission, *Morrison v. Goodspeed,* 100 Colo. 470, 477–78, 68 P.2d 458, 462 (1937), and, by definition, a

---

**3.** We granted certiorari to determine: "[w]hether the court of appeals erred in holding that section 38-10-124(2), C.R.S. (2010), allowed the introduction of extrinsic evidence to interpret an allegedly ambiguous contract." Our de novo review of the contract reveals that it is not, in fact, ambiguous; therefore, we make no determination on whether, under CASOF, extrinsic evidence might be admitted to resolve a facially ambiguous credit agreement. *See, e.g., Barnes v. Dist. Court,* 199 Colo. 310, 312, 607 P.2d 1008, 1009 (1980) ("The duty of this [C]ourt, as of every other judicial tribunal, is to decide actual controversies by a judgment which can be car-

ried into effect, and not to declare principles or rules of law which cannot affect the matter in issue before it." (citation and internal quotation marks omitted)).

**1.** Although the majority does not specify which of Fisher's claims are before us, the court of appeals stated that only Fisher's contractual good faith and fair dealing and fraud claims are at issue on appeal. *Fisher v. Community Banks of Colo., Inc.,* —— P.3d ——, —— (Colo.App.2010) (selected for official publication). I therefore proceed on that assumption.

scrivener's error or mutual mistake would not meet that requirement. This allegation of fraud therefore simply fails on the merits.[2]

¶ 18 Fisher also alleges that Community Banks acted fraudulently when it told him in March 2004 that it would not foreclose on the loan, thereby inducing him to abandon his efforts to find alternate financing. Fisher concedes in his briefing to this Court, however, that CASOF bars such a claim. And indeed it does. As we made clear in *Schoen v. Morris*, CASOF bars any attempt to "maintain ... a claim relating to a credit agreement" that is not signed and in writing. 15 P.3d 1094, 1097 (Colo.2000); § 38–10–124(2), C.R.S. (2012). In this instance, Fisher is attempting to enforce an oral promise not to foreclose upon the loan. That promise would amount to an attempt to enforce an unwritten credit agreement barred by CASOF. *See Premier Farm Credit v. W–Cattle, LLC*, 155 P.3d 504, 515–16 (Colo.App. 2006).

¶ 19 Fisher also alleges that Community Banks falsely represented to a third party— Western, the loan purchaser who eventually foreclosed upon the note—that the 36 percent default interest rate was a "heavily negotiated" term. As a result of this fraudulent misrepresentation, the theory continues, Fisher was forced to enter into a settlement agreement with Western at an elevated 14 percent rate, instead of the six percent rate he believes should control. The fatal flaw in this theory of liability, however, is that alleged fraudulent statement was made to Western, not to Fisher, inducing Western to act to its detriment. *See Morrison*, 100 Colo. at 478, 68 P.2d at 462 (explaining that elements of fraud require plaintiff to have acted upon the misrepresentation to his detriment). In sum, this alleged fraud claim would belong to Western, not Fisher. This theory of fraud therefore fails on the merits.

¶ 20 Fisher offers two final, and interrelated, fraud theories. According to Fisher, Community Banks should have disclosed to him that it was selling the loan to a third

party using a 36 percent default interest rate. Fisher points to no provision of the contract that would have required Community Banks to inform Fisher that it was selling his loan to a third party or to disclose the terms of the sale. And when Western began foreclosure proceedings against Fisher, he argued that the 36 percent was void, negotiating a lower rate in a settlement with Western. Thus even assuming that Community Banks had an obligation to inform Fisher that it was selling the loan to a third party at 36 percent, he fails to identify the action (or inaction) that the alleged fraudulent omission induced on his part. *See, e.g. Kopeikin v. Merchs. Mortg. & Trust Corp.*, 679 P.2d 599, 602 (Colo.1984) (noting that fraudulent omission must induce action or inaction on plaintiff's part).

¶ 21 Finally, Fisher argues that Community Banks should have informed him that the loan documents contained a 36 percent default interest rate. But the rate was contained in the loan documents, and Fisher does not argue otherwise. Even assuming there was an ambiguity created by the "all terms remain the same" language earlier in the documents, there is no basis for placing a duty on Community Banks to inform Fisher of language that the loan documents already contained. On this point, I agree with the majority that Fisher had an obligation to read the documents he had signed. Maj. op. ¶ 11.

¶ 22 Fisher implies that, even if his allegations are not actionable under a fraud theory, Community Banks's "dishonest and commercially unreasonable conduct" would be covered by his claim for contractual good faith and fair dealing. But Fisher misunderstands the scope of contractual good faith and fair dealing. Indeed, in the contractual context, the implied covenant is quite narrow, and applies "only when the manner of performance under a specific contract term allows for discretion on the part of either party." *Amoco Oil Co. v. Ervin*, 908 P.2d 493, 498 (Colo.1995). It is therefore not the general

---

**2.** The usual remedy for mutual mistake or scrivener's error is reformation of the contract. *See Maryland Cas. Co. v. Buckeye Gas Products Co., Inc.*, 797 P.2d 11, 13 (Colo.1990). That remedy

is not available in this case, as Fisher's counsel conceded at oral argument, because the loan was sold to a third party, Western, who in turn foreclosed upon it.

prohibition on commercially unreasonable conduct that Fisher suggests.[3] Instead, in this case, as the trial court correctly held, the only discretionary term in the contract was the 36 percent default interest rate, which allowed Community Banks to charge up to 36 percent. This claim proceeded to the jury, which found in favor of Community Banks. But even if Fisher were permitted to introduce evidence that the 36 percent rate was a mistake and therefore unenforceable, the fact is that Community Banks never invoked the 36 percent against Fisher; indeed, as Fisher concedes in his briefing to this Court, Community Banks at all times, including in writing, negotiated with him based upon the six percent interest rate contained in the first change agreement.

¶ 23 In the end, I agree with the majority that we should largely avoid the question of whether CASOF bars Fisher from introducing extrinsic evidence in this case because, for the most part, the parties do not focus on what the extrinsic evidence actually is in this case. Instead, they argue abstractly that the evidence is either all in (according to Fisher) or all out (according to Community Banks). Given this posture, I would find that, for various reasons, Fisher's fraud and contractual good faith and fair dealing claims fail. Accordingly, I respectfully concur only in the judgment reached by the majority.

JUSTICE COATS, dissenting.

¶ 24 Because I agree entirely with the court of appeals resolution of the borrower's claims currently pending before us, I would affirm its judgment to reverse and remand for a new trial on those claims. I therefore respectfully dissent.

¶ 25 Unlike either the trial court or court of appeals, the majority avoids the central question of the case—whether the Colorado Credit Agreement Act's so-called statute of frauds provision would bar the admission of extrinsic evidence to resolve an ambiguity in the written contract—by simply holding that the subject contract contained no ambiguity permitting the admission of extrinsic evidence in any event. The majority develops no coherent rationale in terms of accepted rules of interpretation supporting this conclusion, but the hints it does offer suggest either a misunderstanding of the provisions of and relationships among the various change agreements or what I consider to be a fundamental misunderstanding of the law governing contract construction.

¶ 26 As the intermediate appellate court carefully pointed out, the original loan agreement in this case contained no separate default interest rate provision whatsoever. The first change agreement contained such a provision, but that provision did not effectuate any operational change because it set the default rate at the note rate. The second change agreement, however, included a special default interest rate of 36 percent, appearing several paragraphs after a provision entitled, DESCRIPTION OF THE CHANGES, which not only failed to mention the new default provision but in fact expressly represented that "[a]ll other terms and conditions remain the same." Like the second change agreement, the third again included the 36 percent special default interest rate, after once more omitting any mention of this special default interest rate in its description-of-changes provision and after once more expressly confirming that "[a]ll other terms and conditions remain the same."

¶ 27 The majority does not appear to dispute the well-accepted proposition that ambiguity in a written contract may be resolved by looking to extrinsic evidence demonstrating the intent of the parties. It is similarly well-accepted, both in and outside this jurisdiction, that an ambiguity permitting resort to extrinsic evidence is established where different provisions of a contract are in irreconcilable conflict. *See Ryan v. Fitzpatrick Drilling Co.*, 139 Colo. 471, 342 P.2d 1040 (1959); *see also People v. Johnson*, 618 P.2d 262, 266 (Colo.1980); *see generally* 11 Richard A. Lord, Williston on Contracts § 30:4,

**3.** Fisher's allegation that Community Banks acted in a commercially unreasonable manner in seeking to foreclose both collateral properties at the same time (the Stanford home and the Telluride vacation property) would not be actionable under a theory of good faith and fair dealing because the foreclosure would not be based on a discretionary term in the contract.

at 46 (4th ed. 1999) (hereafter "Williston"); 5 Margaret N. Kiffin, Corbin on Contracts § 24.23, at 252 (Joseph M. Perillo ed., 1998) (citing *Ryan*). While consideration of the contract as a whole in light of various interpretative aids may help to determine that an apparent conflict between individual words or provisions of the contract does not present an actual conflict at all, if apparently conflicting provisions are not reconcilable by the language of the contract itself, then there exists a facial ambiguity. We have previously held not only that once a court determines a document to be ambiguous, it may consider extrinsic evidence bearing on the intent of the parties, but also that extrinsic evidence may be conditionally admitted to determine whether the contract is actually ambiguous in the first place. *See E. Ridge of Fort Collins, L.L.C. v. Larimer & Weld Irrigation Co.*, 109 P.3d 969, 974 (Colo.2005).

¶ 28 If believed by the trier of fact, the extrinsic evidence offered by Fisher would not only have been powerful on the question of the parties' understanding; it would have been virtually dispositive. The excluded evidence included a handwritten statement on an official loan committee document that all prior terms and conditions (other than a referenced change to the standard interest rate) remained unchanged by the second change agreement; a bank official's deposition testimony that this statement was meant to signal the only change intended in the change agreement; and evidence that the 36 percent default rate was inserted automatically by new bank software without the loan officer's knowledge.

¶ 29 The majority does not suggest that the two disputed provisions of the third change agreement are reconcilable, much less present a coherent rationale for finding that they do not conflict. As best I can determine, the majority opinion does, however, imply two alternate, and inconsistent, theories for finding that the court of appeals erred. First, it appears to believe the court of appeals erred in finding a conflict, and therefore an ambiguity, in the third change agreement by considering the terms of that agreement in light of the change agreements that preceded it. Second, it appears to believe that it can avoid any conflict by choosing, as a matter of law, which of the conflicting provisions will control. I believe both to be clearly erroneous.

¶ 30 With regard to the first theory, in its footnote 2, maj. op. ¶ 11, the majority reproaches the court of appeals for violating what it refers to as a fundamental rule of contract interpretation that the latest iteration of contractual terms controls. To suggest the applicability of this rule to the reasoning of the court of appeals is little short of absurd. The series of change agreements at issue clearly incorporate prior agreements by reference, affirmatively stating that the latest agreement makes no changes from the former, other than those enumerated. To suggest that such a provision does not conflict with the subsequent addition of an unincluded new term because it is impermissible to consult the terms of the prior agreement to tell whether the condition at issue is a change flies in the face of reason.

¶ 31 Although the majority does not further develop it, this criticism of the court of appeals is also suggestive of a more complex, but equally unavailing, argument that was advanced by the Bank but rejected by the court of appeals. The Bank argued that the two provisions at issue in the third and final change agreement were not in conflict at all because the addition of a 36 percent special default rate had actually occurred in the second change agreement, making the assertion of no additional changes in the third change agreement accurate. Like the court of appeals, I (as perhaps does even the majority) consider this argument—that the identical conflict in the second change agreement somehow vanishes by being repeated in the third change agreement—to border upon sophistry. I agree with the court of appeals that this reasoning simply begs the question whether the default rate was ever validly changed to 36 percent.

¶ 32 With regard to the second theory or rationale, the majority offers no reasoning for its conclusion other than to note the clarity of the 36 percent default rate provision; the sophistication of Fisher; and the less than noteworthy proposition that a contract must be interpreted as a whole. On the

basis of these observations, however, it somehow chooses the 36 percent rate provision as controlling and announces, as a matter of law, that there is therefore no ambiguity to be resolved by extrinsic evidence of the parties' intent. Although unstated, the clear implication of this conclusion is that despite an irreconcilable conflict in a written contract, potentially dispositive extrinsic evidence of the intent of the parties may be excluded from the trier of fact and disregarded altogether in favor of a legal determination that one or the other of the conflicting provisions should control. If that is the majority's intention, as I believe its opinion necessarily implies, perhaps the proposition remains unstated for the very reason that it would be unsupported by the law of contract interpretation.

¶ 33 There will undoubtedly forever remain close questions concerning the proper articulation and application of the rules of contract interpretation, as well as debates about the point at which interpretation has crossed over into construction, but I do not believe there can be any serious question that irreconcilable conflicts in a contract amount to an ambiguity in the contract, which must be resolved according to the intent of the contracting parties. One (if not the) primary source for ascertaining the intent of the parties is extrinsic evidence of the circumstances surrounding the execution of the contract. *See generally* Williston § 32:7, at 434–39. Rather than attempting to determine the intent of the parties with regard to inclusion of the special default interest rate, I believe the majority simply imposes its own preference, effectively punishing Fisher for relying on an express provision of the change agreement ensuring him that, having read and understood the original contract, he need read no further.

¶ 34 Because I not only agree with the court of appeals' resolution of this case but also fear the implications of the majority opinion, I respectfully dissent.