**UNPUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

—————

**No. 13-2274**

—————

NORTH CAROLINA FARM BUREAU MUTUAL INSURANCE CO.,

        Plaintiff – Appellee,

    v.

CLEAR TECHNOLOGY, INC.; VERSATA ENTERPRISES, INC.,

        Defendants – Appellants.

—————

Appeal from the United States District Court for the Eastern District of North Carolina, at Raleigh. Terrence W. Boyle, District Judge. (5:12-cv-00111-BO)

—————

Argued: October 28, 2014        Decided: February 4, 2015

—————

Before TRAXLER, Chief Judge, DIAZ, Circuit Judge, and DAVIS, Senior Circuit Judge.

—————

Vacated and remanded by unpublished opinion. Judge Diaz wrote the opinion, in which Chief Judge Traxler and Senior Judge Davis joined.

—————

**ARGUED**: Matthew Nis Leerberg, SMITH MOORE LEATHERWOOD LLP, Raleigh, North Carolina, for Appellants. Walter E. Brock, Jr., YOUNG, MOORE & HENDERSON, PA, Raleigh, North Carolina, for Appellee. **ON BRIEF**: Bradley M. Risinger, SMITH MOORE LEATHERWOOD LLP, Raleigh, North Carolina, for Appellants. Robert Cowan deRosset, IV, YOUNG, MOORE & HENDERSON, PA, Raleigh, North Carolina, for Appellee.

—————

Unpublished opinions are not binding precedent in this circuit.

DIAZ, Circuit Judge:

This appeal arises out of a dispute over the provisions of a software licensing contract between North Carolina Farm Bureau Insurance Company ("NCFB") and software company Clear Technology, Inc. ("Clear Tech"). The parties disagree over the meaning of a $20,000 monthly fee term in an order form, which led to the filing of this lawsuit. Both parties filed motions for summary judgment and the district court granted NCFB's motion, finding that no reasonable jury could find that Clear Tech's interpretation of the fee term was what the parties intended. We disagree and therefore vacate the district court's grant of summary judgment and remand for trial.

## I.

In March 2003, NCFB and Clear Tech entered into a software license and maintenance agreement (the "Master Agreement") under which NCFB was to use Clear Tech's Tranzax software in its insurance policy processing business. The Master Agreement specified that NCFB would pay a $75,000 license fee to use the software, along with a $20,000 annual maintenance fee. Under the terms of the Master Agreement, the NCFB could decline to pay the annual maintenance fee, thereby forgoing maintenance, software updates, and support services.

By entering into the Master Agreement, NCFB was granted a "perpetual, nonexclusive, nontransferable right to use the Tranzax software . . . in accordance with and subject to the terms and conditions of [the] Agreement." J.A. 55. The parties agreed that if NCFB breached the Agreement, Clear Tech could cancel it and NCFB would be required to stop using the software. The parties also agreed that NCFB might order additional modules of the software for other areas of its business, and that the terms of future orders would be subject to and incorporated into the Master Agreement.

In August 2004, the parties executed three new order forms, through which NCFB purchased additional units of Tranzax software for its Policy Processing and Underwriting businesses, as well as a Developer Version License for Tranzax. At issue in this case is Order No. 2, which we reproduce in full below.



| Licensee | **North Carolina Farm Bureau Mutual Insurance Company, Inc.** | Address | 5301 Glenwood Avenue P.O. Box 27427 Raleigh, North Carolina 27611 |
|---|---|---|---|
| Contact | Dennis Nelson, CPCU | | |
| E-mail | nelsondc@ncfbins.com | Telephone | 919-782-1705 |
| Effective Date | August 15, 2004 | Facsimile | |

## COMMERCIAL TERMS
### ("Commercial Terms")

| TRANZAX UNIT OF WORK ("TUW") | ENTITY / DIVISION ("COMMERCIAL ENTITY") | TERRITORY ("TERRITORY") |
|---|---|---|
| Underwriting | North Carolina Farm Bureau Mutual Insurance Company, Inc. (NCFB) | all business written by NCFB covering property in North Carolina and Alabama |
| **LICENSE FEE ("LICENSE FEE")** | **ANNUAL MAINTENANCE FEE ("ANNUAL MAINTENANCE FEE")** | **DESIGNATED LOCATION ("DESIGNATED LOCATION")** |
| $300,000 ON INVOICE $ 20,000 PER MONTH IN ADVANCE (ON INVOICE) | INCLUDED | NCFB OFFICES IN RALEIGH, NC |
| **CLEAR TECH SUPPORT CONTACT DETAILS** | | |
| **ADDITIONAL SERVICES ("ADDITIONAL SERVICES")** | | |
| **SPECIAL TERMS ("SPECIAL TERMS")** | | |

**1. Definition:** "Underwriting" means the process of analyzing, evaluating and determining whether or not to issue policies.

All capitalised terms not defined in this Order Form have the same meaning as in the Software License Agreement dated May 31, 2003 (referred to as the "Agreement"). This Order Form is subject to and incorporates the terms of the Agreement.

By signing below the parties agree to be bound by this Order Form.

| NORTH CAROLINA FARM BUREAU MUTUAL INSURANCE COMPANY, INC. 5301 GLENWOOD AVENUE RALEIGH, NORTH CAROLINA, USA | CLEAR TECHNOLOGY, INC. 11030 CIRCLE POINT ROAD WESTMINSTER, COLORADO, USA TEL: (303) 583 4100 FAX: (303) 449 1548 |
|---|---|
| By _Linda M. Squires_ | By _(signature)_ |
| Name Linda M. Squires | Name Chris Kendall |
| Title Senior Executive Operations and IS | Title Chief Financial Officer |

In Order No. 2, NCFB contracted to use the Tranzax software in its underwriting business. Unlike the Master Agreement,

which explicitly incorporates a separate annual maintenance fee, Order No. 2 does not include such a fee. Rather, maintenance is listed as "Included" in the middle column of the order form. On the far left side of the order form, two fees are listed under the heading "License Fee": $300,000 on invoice, and $20,000 per month in advance (on invoice).

Order No. 2 was signed by Clear Tech's Chief Financial Officer Chris Kendall and NCFB's Senior Executive Linda Squires (after review by NCFB's counsel). NCFB paid the $300,000 license fee, began using Tranzax software in its underwriting business, and started making recurring payments of $20,000 per month.

In 2008, Versata Enterprises, Inc. acquired Clear Tech. In the years following the acquisition, NCFB became dissatisfied with the service and support it was receiving from Clear Tech. Specifically, Clear Tech stopped providing support for an older version of the Tranzax software used heavily by NCFB, and NCFB was redirected from its primary support contact to overseas support services. In response to NCFB's complaints, Clear Tech sent NCFB a new maintenance and support proposal in April 2011. NCFB, however, rejected it.

After receiving its annual service and support renewal notice from Clear Tech on June 15, 2011, NCFB informed Clear Tech that NCFB did not wish to continue receiving maintenance

6

and would allow its service and support contract to expire on August 13, 2011. Clear Tech in turn told NCFB that failure to continue to pay the $20,000 "monthly license fees" under Order No. 2 would constitute a material breach of the parties' agreement, resulting in revocation of NCFB's license to use the software. NCFB responded that it did not intend to stop using the Tranzax software and that it viewed the $20,000 monthly fee as one for optional maintenance, rather than a fee to maintain the license. Clear Tech confirmed that it saw Order No. 2 differently, viewing the $20,000 fee as a monthly license fee. NCFB allowed its service and support contract to lapse on August 13, 2011, but it continued to pay the $20,000 monthly fee (under protest) in order to keep using Clear Tech's software in its underwriting business.

NCFB filed suit in state court, seeking (1) a declaratory judgment allowing it to continue using the Tranzax software without paying the $20,000 monthly fee, and (2) the return of all payments made under protest. Clear Tech removed the case to the district court and filed an answer and counterclaim, seeking a declaratory judgment that the $20,000 monthly fee was a mandatory license fee.

On cross-motions for summary judgment, the district court granted NCFB's motion and denied Clear Tech's motion. Finding that the interplay between Order No. 2 and the Master Agreement

7

was ambiguous, the district court considered extrinsic evidence of the parties' original intent, including emails and the testimony of the signatories to Order No. 2.  The court held that because extrinsic evidence conclusively demonstrated that NCFB had "no obligation to continue paying $20,000 per month in order to preserve its license," J.A. 690, summary judgment in favor of NCFB was proper.  This appeal followed.

## II.

We address two issues on appeal.  First, we consider whether the district court erred in finding that the terms of Order No. 2 are ambiguous, and therefore in admitting extrinsic evidence of the parties' intent.  Second, if the district court properly admitted extrinsic evidence, we must decide whether it erred in concluding that NCFB's interpretation of Order No. 2 is correct as a matter of law.  The ambiguity of a contract and the district court's grant of summary judgment are each questions of law that we review de novo.  Moore Bros. Co. v. Brown & Root, Inc., 207 F.3d 717, 726 (4th Cir. 2000); Pleasant Valley Hosp., Inc. v. Shalala, 32 F.3d 67, 69 (4th Cir. 1994).

### A.

The Master Agreement specifies, and the parties agree, that Colorado substantive law governs this contractual dispute.  Under Colorado law, the goal of contract interpretation is to

8

give effect to the parties' intention, as determined "primarily from the language of the instrument itself." USI Props. E., Inc. v. Simpson, 938 P.2d 168, 173 (Colo. 1997). Colorado courts interpret contract terms not in isolation, but by reading them as a whole and attempting "to harmonize and to give effect to all provisions so that none will be rendered meaningless." Fed. Deposit Ins. Corp. v. Fisher, 292 P.3d 934, 937 (Colo. 2013) (internal quotation mark omitted). Initial review of a contract is typically limited to the document itself; only if that examination reveals that the contractual language is ambiguous will Colorado courts refer to extrinsic evidence to help glean the parties' intent. Simpson, 938 P.2d at 173.

The mere existence of a disagreement between two parties does not in itself create an ambiguity. Rather, a contract is ambiguous only when its language is "fairly susceptible to more than one interpretation." Fibreglas Fabricators, Inc. v. Kylberg, 799 P.2d 371, 374 (Colo. 1990). In determining whether a contract is ambiguous, Colorado law instructs that we initially assume the generally accepted meaning of the terms used. Cheyenne Mtn. Sch. Dist. No. 12 v. Thompson, 861 P.2d 711, 715 (Colo. 1993).

Unlike many jurisdictions, Colorado does not apply a strict "four corners" rule to the initial determination of ambiguity. See Ad Two, Inc. v. City & Cnty. of Denver ex rel. Manager of

9

*Aviation*, 9 P.3d 373, 380 (Colo. 2000) (Hobbs, J., dissenting) (observing that "a steadily increasing number of courts have disavowed the plain meaning rule and have recognized the necessity of viewing extrinsic evidence," and stating that "[i]n Colorado, we have adopted this more flexible approach") (internal quotation marks omitted). Under Colorado law, the court may conditionally admit evidence "bearing upon the meaning of written terms, such as evidence of local usage and of the circumstances surrounding the making of the contract" to help determine whether the contractual language is susceptible to more than one meaning. *Thompson*, 861 P.2d at 715. But "the court may not consider the parties' own extrinsic expressions of intent." *Id.* (internal quotation mark omitted).

In this case, the district court found that, although the disputed $20,000 fee is conspicuously listed under the heading "License Fee" in Order No. 2, its meaning is ambiguous because "it is not clear, when looking at Order No. 2 and the Master Agreement together, whether the monthly $20,000 fee is meant to be a recurring license fee, or a fee for maintenance and support services" that NCFB was free to decline. J.A. 686. In reaching this conclusion, the district court conditionally considered a

10

number of emails exchanged between the parties in mid-2011. [1] The district court observed that in those emails, there appeared to be some confusion regarding the significance of NCFB's decision to discontinue its service and support relationship with Clear Tech. For example, in one message, Clear Tech told NCFB that if it stopped paying the $20,000 fee, NCFB would be required to "immediately cease use of the . . . software," J.A. 158, while in a subsequent email it merely warned NCFB that it would be "operating [the software] in an unsupported environment," J.A. 178.

Although the emails suggest the possibility of confusion between the parties, they do not, standing alone, demand the conclusion that the written terms of Order No. 2 are ambiguous. [2] Nonetheless, we agree with the district court that the $20,000

---

[1] Because contemporaneous emails are evidence of "the circumstances surrounding the making of the contract" and are not post hoc expressions of the parties' intent, the district court properly considered them in making the initial ambiguity determination. Thompson, 861 P.2d at 715.

[2] It appears that NCFB may have combined its annual maintenance payment under the Master Agreement with a consolidated payment of the entire year's $20,000 monthly fees under Order No. 2. If so, Clear Tech's inconsistent messages may be explained by the fact that some of the emails (specifically those referring to operating in an unsupported environment) refer to NCFB's decision to stop paying the annual maintenance fee under the Master Agreement, while others (those directing NCFB to discontinue use of the software) refer to the discontinuation of the $20,000 monthly fee payment under Order No. 2 that Clear Tech maintains was for the license.

monthly fee in Order No. 2 is ambiguous when viewed in conjunction with the Master Agreement and in the context of the emails exchanged between the parties at the time the agreement was formed.

Viewed in isolation, Order No. 2 is relatively straightforward. The $20,000 fee is conspicuously placed under the heading "License Fee," which divides the fee into two components: a one-time $300,000 payment and a $20,000 monthly payment to be paid in advance on invoice. The word "Included" appears under the heading "Annual Maintenance Fee," which suggests that the $20,000 fee is not an annual maintenance fee. However, because Order No. 2, "is subject to and incorporates" the terms of the Master Agreement, we may not view it in isolation and instead must construe it with reference to the Master Agreement.

The Master Agreement makes no mention of recurring license fees. Instead, it refers exclusively to "the License Fee," J.A. 55 (emphasis added), and it does not appear that Clear Tech charged a monthly license fee for any other product purchased by NCFB. The agreement provides that "Annual Maintenance Fees will be invoiced yearly," id., but says nothing of invoices for recurring license fees. Thus, only two categories of fees were explicitly contemplated at the time the parties executed the

12

Master Agreement: (1) one-time license fees, and (2) annual maintenance fees.

However, the Master Agreement also provides that NCFB's license to use Tranzax will be "perpetual . . . subject to the terms and conditions of [the] Agreement." Id. The disputed term in this case appears on its face to be a recurring license fee, and it therefore does not fit neatly into either of the fee categories set out in the Master Agreement. Although the Master Agreement makes clear that "the agreement" between the parties includes "any subsequent order form," J.A. 54, the inconsistency between the fees described in the Master Agreement and those contained in Order No. 2 renders the $20,000 fee term susceptible to more than one interpretation.

The ambiguity as to this term is compounded by an email sent by Clear Tech immediately before the parties signed Order No. 2. In July 2004, Clear Tech's Chief Executive Officer John Kendall wrote the following to NCFB's Linda Squires summarizing Order No. 2:

> License Fees: We agreed that we will structure a License Agreement based on each area that Tranzax will be deployed as a specific"module" [sic]. So for example we will charge $300k, plus $20k per month (for maintenance) for the License to use Tranzax in the Underwriting area/s at NCFB.

J.A. 87 (emphasis added). Clear Tech's characterization in this email of the $20,000 monthly fee as both "for maintenance" and

13

"for the License" further supports the conclusion that the $20,000 fee term in Order No. 2 is ambiguous.

B.

Because the terms of Order No. 2 are ambiguous, we (like the district court) may consider extrinsic evidence bearing on the parties' mutual intent at the time they entered into the contract. Thompson, 861 P.2d at 715. And because Clear Tech drafted the Master Agreement and Order No. 2, we construe those documents against Clear Tech. Id. at 716.

The district court found that because Clear Tech "offered no material evidence" to dispute NCFB's interpretation of the $20,000 fee, there was no genuine issue of material of fact surrounding the meaning of the $20,000 fee term and summary judgment in favor of NCFB was appropriate. We disagree.

To be sure, the record contains considerable evidence supporting NCFB's view that the parties intended the $20,000 monthly fee to be for maintenance and not for the license. As previously discussed, the Master Agreement does not contemplate any monthly license fees. The only recurring fees found in the Master Agreement are annual maintenance fees, which were optional and not linked in any way to NCFB's licenses to use the software. In addition, Clear Tech's then-CEO John Kendall described the $20,000 fee as "for maintenance" in his email to Linda Squires as the two were discussing Order No. 2.

14

The deposition testimony of John and Chris Kendall and Linda Squires also weighs in favor of NCFB's interpretation of Order No. 2. Although John Kendall mentioned both the $300,000 fee and the recurring $20,000 fee when asked "what the license fee was," he then clarified that the $20,000 fee was for maintenance and support and was not a license fee. J.A. 257. When asked what portion of the $20,000 fee was for the license (as opposed to maintenance and support), Chris Kendall testified, "My recollection is zero." J.A. 268. And Linda Squires stated that it was "clearly communicated" that the $20,000 fee was for maintenance. J.A. 284.

However, the record also contains evidence from which a reasonable jury could side with Clear Tech. For one, the placement of the $20,000 monthly fee under the heading "License Fee" (and the notation that Annual Maintenance was "Included") on the parties' contract, which was reviewed by NCFB's counsel before it was executed, weighs in favor of Clear Tech's interpretation. A jury might also conclude that John Kendall's July 2004 email listing the $20,000 monthly fee under the heading "License Fees" (plural) and describing the fee as "for the License" indicates that it was intended to be a mandatory license fee.

Clear Tech also introduced uncontroverted testimony from an expert on software contracts, who opined that mandatory

15

recurring license fees (even in conjunction with up front, one-time license fees) are typical in the industry and are often structured to include maintenance. He also contrasted the "perpetual" license in the parties' Master Agreement with an "irrevocable" license, and clarified that the former is subject to the terms and conditions of the parties' agreement, which included NCFB's continued payment of license fees. J.A. 436.[3]

Clear Tech's argument finds further support in the testimony of its then-Vice President of Sales and Marketing Geoff Smyth, who stated that in 2004, Clear Tech "was actively seeking to increase the amount of recurring license revenue it received as opposed to the amount of recurring maintenance revenue it received." J.A. 635. According to Smyth, Clear Tech sought to accomplish this by "negotiat[ing] agreements with its customers whereby customers licensed Clear's technology on a subscription basis" with maintenance "included in the subscription license price." Id. A jury might choose to credit Smyth's testimony over that of John and Chris Kendall, who no longer worked for Clear Tech and were testifying over eight years after Order No. 2 was signed.

---

[3] In contrast, Clear Tech's expert explained, an "irrevocable" license "continue[s] forever no matter what--<u>even if the licensee breaches the license agreement</u>." J.A. 436 (emphasis added and internal quotation marks omitted).

Indeed, nothing in the Master Agreement precludes a finding that, for purposes of Order No. 2, NCFB agreed to pay a monthly license fee that <u>also included</u> non-cancellable maintenance. Although the Master Agreement permits NCFB to opt out of the "Annual Maintenance Fee," it does not bar the parties from contracting for a mandatory <u>monthly</u> fee, whether for the license or for maintenance. Thus, even if NCFB were able to demonstrate that the $20,000 monthly fee was intended to cover maintenance, it would not necessarily follow that it was optional. We also note that the first Order No. 2 invoice that Clear Tech sent to NCFB, which NCFB paid, lists the $20,000 fee as a "Monthly License and Maintenance Fee." J.A. 291. In light of this evidence, a reasonable jury could conclude that the $20,000 monthly fee was intended to be a mandatory recurring license or maintenance fee.

In sum, on this record, the district court erred in deciding that there was no genuine issue for trial.

## III.

For the foregoing reasons, we vacate the district court's order granting NCFB's motion for summary judgment and remand this case for trial.

<u>VACATED AND REMANDED</u>

17