FILED
United States Court of Appeals
Tenth Circuit

May 17, 2018

Elisabeth A. Shumaker
Clerk of Court

**UNITED STATES COURT OF APPEALS**

**FOR THE TENTH CIRCUIT**

NATIONAL UNION FIRE INSURANCE
COMPANY OF PITTSBURGH, PA,

     Plaintiff - Appellee,

v.

FEDERAL INSURANCE COMPANY,

     Defendant - Appellant.

No. 16-1438
(D.C. No. 1:13-CV-00079-PAB-KMT)
(D. Colo.)

**ORDER AND JUDGMENT**[*]

Before **LUCERO**, **McKAY**, and **McHUGH**, Circuit Judges.

This is a dispute over the proper interpretation of an insurance contract between

National Union Fire Insurance Company and Intrawest ULC.  Federal Insurance

Company, which contracted to provide Intrawest with a $10 million umbrella policy on

top of the coverage from National, appeals the district court's summary judgment order in

favor of National.  We affirm the district court.

I.

Intrawest is a developer that builds ski resort projects throughout the western

United States.  In 1998, Intrawest hired broker Willis Corroon Construction Services

_____

[*] This order and judgment is not binding precedent, except under the doctrines of
law of this case, res judicata, and collateral estoppel. It may be cited, however, for its
persuasive value consistent with Fed. R. App. P. 32.1 and 10th Cir. R. 32.1.

Corporation of Connecticut to secure an owner-controlled insurance program for Intrawest's operations during and after construction. Responding to Willis's request for primary coverage, National sent a proposal offering $5 million per project in general liability coverage, capped by an overall $15 million general liability aggregate for all locations. The proposal also allowed for $5 million in products/completed-operations coverage per location, with an overall products/completed-operations aggregate of $5 million. Products/completed-operations coverage refers to insurance for certain types of damages arising out of the insured's projects or business operations once those operations have been completed or abandoned.

After Willis accepted the proposal, National issued a "Binder of Coverage"—a series of documents that gave Intrawest evidence of coverage, but would be superseded when the actual policy was issued. The Binder described the coverages to be provided as follows:

*Limits of Liability*

*Per Location*:
| | |
|---|---|
| Bodily Injury & Property Damage | $2,000,000 Each Occurrence |
| Personal/Advertising Injury | $2,000,000 Each Occurrence |
| General Aggregate | $5,000,000 Per Project |
| Medical Expense | $5,000 |
| Fire Damage Legal | $100,000 |
| Products/Completed Operations | $5,000,000 |

*All Locations*:
| | |
|---|---|
| General Aggregate | $15,000,000 |
| Products Completed Operations | $5,000,000 |

(Appellant's App. at 500.) The Binder further explained that the completed-operations aggregate did not renew each year, but instead applied for the entirety of a five-year

2

extended reporting period. (*Id*.) Around this time, on May 13, 1998, a representative from Willis emailed National to "confir[m] that the Completed Operations Extension applies on a 'per project' basis similar to the 'primary' [general coverage liability]." (*Id*. at 522.) National's representative confirmed that "[t]he limit will apply per project," but reiterated that "there is only one aggregate for the entire Extension Period" and "the total aggregate for all losses in the Extension will remain $5,000,000." (*Id.*)

In March 1999, National issued the actual policy, which included an endorsement providing for a five-year extension of the products/completed-operations coverage. The extension set a "products/completed operations limit [of] $5,000,000 each occurrence and $5,000,000 Aggregate for the [five-year] completed operations period." (*Id.* at 517.) The policy also contained a restrictive integration clause, which provided:

> This policy contains all the agreements between you and us concerning the insurance afforded. The first Named Insured shown in the Declarations is authorized to make changes in the terms of this policy with our consent. This policy's terms can be amended or waived only by endorsement issued by us and made a part of this policy.

(*Id.* at 1184.)

Willis and National exchanged a number of emails in the months that followed regarding corrections and clarifications to the policy. After consulting the May 13, 1998 email exchange between Willis and National, National issued a corrected version of the 1998-1999 policy, which included Endorsement 9:

> It is agreed that, Products Completed Operations coverage is extended for a period of ten (10) years which will commence when that portion of the project is put to its intended use or a temporary or permanent certificate of occupancy is issued. The products/completed operations limit is

3

$5,000,000 each occurrence and $5,000,000 Aggregate for the extended completed operations period.

It is also agreed and understood that the Products and Completed Operations Aggregate is not reinstated annually, however, it does apply separately on a per project basis.

(*Id.* at 1565.)

In June 2000, Intrawest executed an Indemnity Agreement with National. The Agreement explained that National was "providing a unique insurance and premium payment program (the 'Program') to meet the special needs of [Intrawest]" and would "issue certain insurance policies listed in the Policy and . . . Schedule(s)." (*Id.* at 388-89.) Article I further stated:

Such policies and all renewal addendum[s] are governed by this Agreement and are referred to herein as the "Policy(ies)." This Agreement, together with the Schedule(s) and Policy(ies), constitutes the Program. The Program is a uniquely negotiated, single contract and no part of the Program would have been issued without the other parts being in force. Unless otherwise agreed, should the parties later adopt revised or different Schedule(s) or issue additional Policies, such Schedule(s) and Policy(ies) shall be subject to this Agreement and be part of the Program.

(*Id.* at 389.) The Indemnity Agreement included a Paid Loss Addendum and a schedule, both of which showed a $5 million products/completed-operations aggregate "Per Project" and an overall $5 million products/completed-operations aggregate for "All Projects." (*Id.* at 392, 394-96, 2478-80.) Following the Program's three-year term, Intrawest and National extended their contract for an additional fourteen months, executing a second schedule that again listed a single $5 million aggregate for all products/completed operations.

4

In addition to this policy with National, Willis secured several more levels of insurance coverage for Intrawest, including a $10 million umbrella policy from Federal Insurance Company, a $25 million excess policy from Reliance National, and, finally, another $40 million excess policy from Federal. All told, Willis negotiated an $80 million insurance tower for Intrawest.

Several years later, Intrawest was sued for construction defects on two different projects. National refused to pay more than $5 million aggregate toward these products/completed-operations suits, so Federal paid the remaining settlement of $6.7 million. In January 2013, National sued Intrawest and Federal, seeking a declaratory judgment that its products/completed-operations coverage was limited to a $5 million aggregate for *all* projects. Federal filed an answer and counterclaims seeking reimbursement and a declaratory judgment that National was contractually obligated to provide *each* Intrawest project with a separate $5 million aggregate limit for products/completed-operations claims. The parties then filed cross-motions for summary judgment. The district court granted National's motion, holding that the Program as a whole provides a maximum of $5 million in completed-operations coverage for all of Intrawest's projects combined. Federal now appeals.

II.

We review the district court's summary judgment decision de novo. *Fox v. Transam Leasing, Inc.*, 839 F.3d 1209, 1213 (10th Cir. 2016). Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). Where

5

the parties have filed cross-motions for summary judgment, we "must view each motion separately, in the light most favorable to the non-moving party, and draw all reasonable inferences in that party's favor." *United States v. Supreme Court of N.M.*, 839 F.3d 888, 906-07 (10th Cir. 2016) (quotation marks omitted).

This case was brought in federal court under diversity jurisdiction, so Colorado's substantive law applies. *See Erie R. Co. v. Tompkins*, 304 U.S. 64, 72-73 (1938). We review interpretations of Colorado law de novo. *United Fire & Cas. Co. v. Boulder Plaza Residential, LLC*, 633 F.3d 951, 956 (10th Cir. 2011); *Mincin v. Vail Holdings, Inc.*, 308 F.3d 1105, 1108-09 (10th Cir. 2002). In interpreting Colorado law, decisions of Colorado appellate courts should generally be followed unless there is convincing evidence that the highest court would decide otherwise. *See United Fire*, 633 F.3d at 957.

As this court explained in *Greystone Construction, Inc. v. National Fire & Marine Insurance Co.*,

> Under Colorado law, we construe insurance policies using general principles of contract interpretation. Thus, absent indication by the parties to the contrary, a policy's language must be construed in accordance with the plain meaning of the words used. And in determining the meaning of a policy, we must interpret a contract in its entirety with the end in view of seeking to harmonize and to give effect to all provisions so that none will be rendered meaningless. Finally, because of the unique nature of insurance contracts and the relationship between the insurer and the insured, [we] construe ambiguous provisions against the insurer and in favor of providing coverage to the insured.

661 F.3d 1272, 1283-84 (10th Cir. 2011) (citations and quotation marks omitted). A court may consider extrinsic evidence bearing on the meaning of written terms when

6

deciding whether a contract is ambiguous, but may not consider "the parties' own extrinsic expression of intent." *Bledsoe Land Co. LLLP v. Forest Oil Corp.*, 277 P.3d 838, 843 (Colo. App. 2011) (citations and quotation marks omitted). Divergent contract interpretation between the parties "does not in itself create an ambiguity as a matter of law." *Id.*

This is a case of contract interpretation concerning the amount of products/completed-operations coverage that National promised to Intrawest. National maintains that the products/completed-operations coverage had a $5 million aggregate for all locations and projects, which could be used up by any one project or by a combination of projects until the $5 million cap was reached. Federal, as Intrawest's umbrella policy insurer, argues that Endorsement 9 established a $5 million aggregate per project, meaning that each project could separately use up to $5 million in products/completed-operations coverage.

In interpreting the policy, we must begin with the plain language of the contract. Federal contends that we need look no further than Endorsement 9 and its statement that the "Products and Completed Operations Aggregate is not reinstated annually, however, it *does apply separately on a per project basis*" to conclude that National contracted to provide Intrawest with a $5 million aggregate for each project. (Appellant's App. at 1565 (emphasis added).) Federal argues that the policy's Integration Clause, which precludes modification of the policy except through endorsement, prevents us from looking any further. *See Brooks v. Timberline Tours, Inc.*, 127 F.3d 1273, 1275-76 (10th Cir. 1997) ("[A]n integration clause . . . prevents [the opposing party] from presenting extrinsic

7

evidence to prove the existence of their alleged prior agreements."). Federal urges us to conclude that Endorsement 9 is clear on its face, meaning that we may not consider any extrinsic evidence in our decision. *See Am. Family Mut. Ins. Co. v. Hansen*, 375 P.3d 115, 117 (Colo. 2016).

While we may not need to consult extrinsic evidence, this court must consider the contract between National and Intrawest in its entirety for the purpose of "seeking to harmonize and to give effect to all provisions so that none will be rendered meaningless." *Copper Mountain, Inc. v. Indus. Sys., Inc.*, 208 P.3d 692, 697 (Colo. 2009) (citation omitted). We find it unlikely that the entirety of the contract between National and Intrawest is contained in the four corners of Endorsement 9. Indeed, the Indemnity Agreement explicitly states that "[t]his Agreement, together with the Schedule(s) and Policy(ies), constitutes the Program," which "is a uniquely negotiated, single contract." (Appellant's App. at 2500-01.) The Agreement governs the existing "policies and all renewal addendum[s]," and further provides that "should the parties later adopt revised or different Schedule(s) or issue additional Policies, [they] shall be subject to this Agreement and be part of the Program." (*Id.*) It is clear from this language that we must look at not only Endorsement 9, but the Indemnity Agreement, the policies, and the schedules in order to understand the plain language of the contract as a whole. *See Gorsuch, Ltd., B.C. v. Wells Fargo Nat'l Bank Ass'n*, 771 F.3d 1230, 1238 (10th Cir. 2014) ("If an agreement is contained in multiple documents, courts construe those documents together."); *Copper Mountain*, 208 P.3d at 697; *U.S. Fid. & Guar. Co. v. Budget Rent-A-Car Sys., Inc.*, 842 P.2d 208, 213 (Colo. 1992) (a court must determine

8

the meaning of a contract by examining "the entire instrument and not by viewing clauses or phrases in isolation").

Despite the plain language of the Indemnity Agreement defining the various documents as a single contract, Federal contends that the Agreement and schedules are actually improper extrinsic evidence. Federal would have us view the Indemnity Agreement as a totally separate contract that "postdates the issuance of Endorsement 9" and, therefore, constitutes impermissible extrinsic evidence. (Appellant's Br. at 18.) Yet, Intrawest presumably read the language in Article I of the Indemnity Agreement and understood that the Agreement, schedules, and policies would be viewed together as a "single contract." (Appellant's App. at 2500-01.) Intrawest knew the contents of the policy and endorsements, including Endorsement 9, when it executed the Indemnity Agreement. If Intrawest had objections to the Indemnity Agreement's characterization of the Program documents as a "uniquely negotiated, single contract," it should have raised them at that time. (*Id*.) Similarly, we see no reason that the policy's Integration Clause, which states that the "policy's terms can be amended or waived only by endorsement," would preclude consideration of the Indemnity Agreement and its accompanying documents. If we read the contract as a whole in a way that harmonizes all the language concerning products/completed-operations coverage, as discussed below, the Integration Clause does nothing to amend or waive the policy's terms.

Having adopted the Indemnity Agreement's definition of the Program as a "uniquely negotiated, single contract" made up of the Agreement, schedules, and policies, we next must examine what the documents say about the extent of

9

products/completed-operations coverage. The policy's "Limits of Insurance" section explains that the "Products-Completed Operations Aggregate Limit is the most [National] will pay" for products/completed-operations damages. (*Id*. at 1563.) The declarations page of the policy then lists the products/completed-operations aggregate limit as $5 million. (*Id*. at 1561.) Endorsement 9 confirms this coverage cap, explaining that the "completed operations limit is . . . $5,000,000 aggregate for the extended completed operations period." (*Id*. at 1565.) The Schedules that accompanied the Indemnity Agreement further clarify the aggregate $5 million limit for Intrawest's products/completed-operations coverage from National. Both the original and 2001 renewal schedules set forth a $5 million "Per Project" products/completed-operations aggregate subject to a $5 million "All Projects" products/completed-operations aggregate. (*Id*. at 2480, 2487.) Indeed, after reviewing the briefs and the entire record, the only language we could find—and the only language Federal presents—to potentially support $5 million products/completed-operations coverage for each and every project comes from the single phrase in Endorsement 9: "the Products and Completed Operations Aggregate is not reinstated annually, however, it does apply separately on a per project basis." (*Id*. at 1565.)

The parties have offered two arguments regarding the meaning of this phrase in Endorsement 9. According to National, the statement was intended to clarify the fact that the $5 million products/completed-operations aggregate could be used entirely by any one project rather than on some type of pro rata basis, as long as the total amount of

products/completed-operations coverage for all products did not exceed $5 million. A number of Intrawest's development locations had multiple projects—hence, the "per project" language. Federal, in turn, argues that the "per project" language of Endorsement 9 created a new $5 million products/completed-operations aggregate for each and every one of Intrawest's projects, with no overall aggregate limit for all projects. This interpretation contradicts the language of the policy and schedules, and creates internal tension within the text of Endorsement 9 itself.

Under Colorado law, "the meaning of a contract is found by examination of the entire instrument and not by viewing clauses or phrases in isolation." *FDIC v. Fisher*, 292 P.3d 934, 937 (Colo. 2013) (citation omitted). When available, a court must adopt the interpretation that best "harmonize[s] and . . . give[s] effect to all provisions [of the contract]." *See Copper Mountain*, 208 P.3d at 697 (citation omitted); *see also In re Town of Estes Park*, 677 P.2d 320, 326 (Colo. 1984) ("[T]o determine intent, a contract must be construed as a whole and effect must be given to every provision, if possible.") National's interpretation of Endorsement 9 resolves all facial contradictions within the various contract documents and achieves harmony between the contract provisions, while Federal's interpretation would render several provisions of the contract meaningless. For this and all the reasons discussed above, we conclude that the Program unambiguously set a $5 million products/completed-operations coverage aggregate for all locations. Endorsement 9 is consistent with this interpretation. Because we find no ambiguity in Endorsement 9 or anywhere else in the contract, we see no reason to consult extrinsic evidence in reaching our decision. *See Ad Two, Inc. v. City & Cty. of Denver*, 9 P.3d 373,

11

376-77 (Colo. 2000) ("Absent such ambiguity [in the terms of the agreement], we will not look beyond the four corners of the agreement to determine the meaning intended by the parties.").

III.

We **AFFIRM** the district court's decision to grant National's motion for summary judgment.

ENTERED FOR THE COURT


Monroe G. McKay

Circuit Judge
