BLEDSOE LAND COMPANY LLLP; Bledsoe Ranch Co., a Colorado general partnership; Company B(COB), a Colorado partnership; Bledsoe Cattle Company, a co-partnership; Lucile M. Bledsoe; Lucile M. Bledsoe, Trustee of Henry A. Bledsoe Marital Trust; Robert E. Bledsoe; Rebecca K. Bledsoe; Grant H. Bledsoe; Ann E. Soehner; James J. Bowman; Sandra Ann Bowman, a/k/a S.A. Bowman, individually and as attorney-in-fact for Matthew D. Bowman; S.A. Bowman, Trustee of the JB Farm Family Trust; James Jason Bowman, Trustee of the JB Farm Family Trust; and Matthew Daniel Bowman, Trustee of the JB Farm Family Trust, Plaintiffs–Appellees and Cross–Appellants,

v.

FOREST OIL CORPORATION, a New York corporation; and Omimex Petroleum Inc., a Delaware corporation, Defendants–Appellants and Cross–Appellees.

No. 09CA2807.

Colorado Court of Appeals, Div. IV.

June 23, 2011.

Rehearing Denied July 21, 2011.

Phillip D. Barber P.C., Phillip D. Barber, Denver, Colorado, for Plaintiffs–Appellees and Cross–Appellants.

Holme Roberts & Owen LLP, Spencer T. Denison, Brent E. Rychener, David A. Tonini, Denver, Colorado, for Defendants–Appellants and Cross–Appellees.

Opinion by Judge GRAHAM.

In this dispute alleging breach of an oil and gas lease, defendants, Forest Oil Corporation and Omimex Petroleum Inc. (collectively, Forest Oil), appeal the trial court's judgment in favor of plaintiffs, Bledsoe Land Company LLLP, Bledsoe Ranch Co., Company B(COB), Bledsoe Cattle Company, Lucile M. Bledsoe, Lucile M. Bledsoe as Trustee of Henry A. Bledsoe Marital Trust, Robert E. Bledsoe, Rebecca K. Bledsoe, Grant H. Bledsoe, Ann E. Soehner, James J. Bowman, Sandra Ann Bowman individually and as attorney-in-fact for Matthew D. Bowman, and S.A. Bowman, James Jason Bowman, and Matthew Daniel Bowman as Trustees of the JB Farm Family Trust (collectively, the Bledsoes). Because we conclude that the trial court erred in its interpretation of the lease, we reverse.

## I. Background

The Bledsoes own a ranch covering 60,418.79 gross surface acres and 37,771.64 net mineral acres in Yuma and Phillips Counties, Colorado (the Ranch). The Ranch is located on the Niobrara formation, a mineral formation with the potential to produce oil and gas.

In September 2001, the Bledsoes entered into a lease with William H. Champion, an oil and gas landman [1] doing business for Tipperary Oil & Gas Corporation, granting Tipperary the right to explore and develop the minerals on the Ranch through drilling for and production and sale of oil and gas (the Lease).

The Lease is a "Producers 88—Paid Up" form contract with several attached exhibits detailing additional lease provisions and providing legal descriptions of the Ranch. As relevant here, the Lease contains standard habendum [2] and Pugh [3] clauses and Exhibit A to the Lease contains alterations of those clauses. The habendum clause provides:

---

1. A landman is "[a]n employee or independent contractor of an oil company whose primary duties are the management of the company's relations with its landowners. Such duties include the securing of oil and gas leases, lease amendments, pooling and unitization agreements and instruments necessary for curing title defects from landowners." 8 Howard R. Williams & Charles J. Meyers, *Oil and Gas Law: Manual of Terms* 541 (2010) (*Manual of Oil and Gas Terms*).

2. A habendum clause is "[t]he clause in a deed or lease setting forth the duration of the grantee's or lessee's interest in the premises." *Manual of Oil and Gas Terms*, at 465. The primary term of the Lease was five years.

3. A Pugh clause is "[t]he name given to a type of pooling clause which provides that drilling operations on or production from a pooled unit or units shall maintain the lease in force only as to lands included within such unit or units." *Manual of Oil and Gas Terms*, at 849.

1. It is agreed that this lease shall remain in force for the term of five (5) years from this date and as long thereafter as oil or gas of whatsoever nature or kind is produced from said leased premises or on acreage pooled therewith, or drilling operations are continued as hereinafter provided. If, at the expiration of the primary term of this lease, oil or gas is not being produced on the leased premises or on acreage pooled therewith but Lessee is then engaged in drilling or re-working operations thereon, then this lease shall continue in force so long as operations are being continuously prosecuted on the leased premises or on acreage pooled therewith; and operations shall be considered to be continuously prosecuted if not more than ninety (90) days shall elapse between the completion or abandonment of one well and the beginning of operations for the drilling of a subsequent well.

Exhibit A modified the habendum clause in pertinent part as follows:

Notwithstanding the provisions of this lease to the contrary, this lease shall terminate at the end of the primary term or any extension thereof as to all of the leased land except those lands within any Governmental Section in which is located a well producing or capable of producing oil and/or gas or on which lessee is engaged in drilling or reworking operations. This lease shall not terminate so long as drilling or reworking operations are being continuously prosecuted if not more than 180 days shall lapse between the completion or abandonment of one well and the beginning of operations for the drilling of another well.

In consideration for the Lease the Bledsoes received a $566,574.45 signing bonus and a 16% royalty interest in all oil and gas produced and sold from the Ranch.

The Lease continued in effect after expiration of the primary term based upon the production and drilling of new wells on the Ranch. By 2007, approximately 150 wells had been drilled. In June 2007, the Lease was assigned to Forest Oil.

On July 17, 2007, Forest Oil began drilling Bledsoe Well # 10-6-5-44. On July 19, 2007, Forest Oil reached the target depth of the well, cased [4] the well, and released the drilling rig. On August 1, 2007, the well was perforated.[5] On August 9, 2007, the well was hydraulically fractured.[6] Forest Oil commenced the next well, Bledsoe Well # 8-3-5-45 on February 1, 2008, beyond 180 days from the date at which Well # 10-6-5-44 was cased and the drilling rig released, but within 180 days from the date Well # 10-6-5-44 was fractured.

Prior to the commencement of Well # 8-3-5-45, the Bledsoes, through their attorney, notified Forest Oil that it was in breach of the 180-day provision in Exhibit A to the Lease and demanded surrender of all property under the Lease not held by production. According to the Bledsoes, Well # 10-6-5-44 was completed on July 19, 2007, the day the drilling rig was released. Therefore, according to the Bledsoes, more than 180 days passed between "completion" of Well # 10-6-5-44 and the commencement of Well # 8-3-5-45.

Forest Oil responded that Well # 10-6-5-44 was not "complete" until it had been hydraulically fractured on August 9, 2007, and, therefore, only 176 days had passed between completion of Well # 10-6-5-44 and commencement of Well # 8-3-5-45. Conse-

---

4. Casing is "[h]eavy steel pipe used to seal off fluids from the hole or to keep the hole from caving in.... Most oil wells are [fitted] with two strings of cemented casings, the surface pipe and the production string. The surface pipe serves as conductor of the drilling fluid through loose, near-surface formations during deeper drilling.... The production string serves as a conduit to the surface for produced fluids and confines each fluid-bearing zone to its native place." *Manual of Oil and Gas Terms,* at 131.

5. A well is perforated by "[t]he making of holes in casing and cement (if present) to allow formation fluids to enter the well bore." *Manual of Oil and Gas Terms,* at 751–52.

6. Hydraulic fracturing is a "mechanical method of increasing the permeability of rock, and thus increasing the amount of oil or gas produced from it. The method employs hydraulic pressure to fracture the rock." *Manual of Oil and Gas Terms,* at 479.

quently, Forest Oil refused to surrender the Lease.

In July 2008, the Bledsoes filed this action seeking declaratory relief and termination of the Lease, as well as damages for trespass, nuisance, conversion, breach of contract, breach of the implied covenants of exploration and development, and statutory damages under sections 38–42–104 and 38–42–105, C.R.S.2010. The Bledsoes alleged Forest Oil failed to drill a new well within 180 days of completion of a prior well and failed to continuously prosecute wells on the Ranch as required by the Lease. Prior to trial, the Bledsoes voluntarily dismissed the conversion and breach of contract claims.

A trial was held to the court on September 21 through 30, 2009, at which numerous witnesses testified and numerous exhibits were introduced. After completion of the trial, the court issued detailed written findings of fact and conclusions of law and entered judgment in favor of the Bledsoes.

In its judgment, the trial court concluded the following:

- The language of the modified habendum and Pugh clauses created two affirmative obligations on Forest Oil: (1) to continuously prosecute drilling or reworking operations; and (2) to drill a new well every 180 days.
- In order to "continuously prosecute" under the Lease, Forest Oil was required to drill or re-work wells on a "continuous, uninterrupted and nonstop" basis.
- The term "completion" in the Lease was ambiguous.
- Based upon the ambiguity, the extrinsic evidence at trial established that the parties agreed a well would be completed once it had been drilled, logged, and either cased or abandoned.

Based upon its interpretation of the Lease, the trial court held that Forest Oil failed to drill a new well within 180 days of completion and failed to continuously prosecute drilling and reworking operations on the Ranch.

The trial court denied the Bledsoes' claims for breach of the implied covenants of exploration and development, concluding the express provisions of the Lease displaced any implied covenants.

Finally, the trial court determined the Bledsoes were entitled to statutory damages, costs, and attorney fees under section 38–42–105. However, the trial court denied the Bledsoes' request for discretionary "additional damages" under that section.

## II. Interpretation of the Lease

On appeal, Forest Oil contends the trial court erred in its interpretation of the terms "completion" and "continuously prosecuted" as used in the Lease. We agree.

■ The interpretation of a contract is a question of law that we review de novo. *Boulder Plaza Residential, LLC v. Summit Flooring, LLC,* 198 P.3d 1217, 1220 (Colo. App.2008); *see also Lake Durango Water Co. v. Pub. Utils. Comm'n,* 67 P.3d 12, 20 (Colo. 2003) (contract interpretation is a question of law).

■ When interpreting a contract, our task is to give effect to the intent of the parties. *Ad Two, Inc. v. City & County of Denver,* 9 P.3d 373, 376 (Colo.2000). "The intent of the parties to a contract is to be determined primarily from the language of the instrument itself." *Id.* That "language must be examined and construed in harmony with the plain and generally accepted meaning of the words used, and reference must be made to all the agreement's provisions." *Fibreglas Fabricators, Inc. v. Kylberg,* 799 P.2d 371, 374 (Colo.1990). When several documents are part of a single transaction, they should be read together as a whole, not in isolation, to determine the parties' intent. *In re Water Rights of Town of Estes Park,* 677 P.2d 320, 327 (Colo.1984).

■ Courts may not rewrite clear and unambiguous contract provisions. *Chacon v. Am. Family Mut. Ins. Co.,* 788 P.2d 748, 750 (Colo.1990); *Weitz Co. v. Mid–Century Ins. Co.,* 181 P.3d 309, 312 (Colo.App.2007).

To ascertain whether certain provisions of a contract are ambiguous, "the language used therein must be examined and construed in harmony with the plain and generally accepted meaning of the words em-

ployed and by reference to all the parts and provisions of the agreement and the nature of the transaction which forms its subject matter."

*Cheyenne Mountain School Dist. No. 12 v. Thompson,* 861 P.2d 711, 715 (Colo.1993) (quoting *Christmas v. Cooley,* 158 Colo. 297, 301, 406 P.2d 333, 335 (1965)); *see Fort Lyon Canal Co. v. High Plains A & M, LLC,* 167 P.3d 726, 729 (Colo.2007) (in construing contracts it may be appropriate to look beyond the "four corners" of the document but "extrinsic evidence of intent can never contradict or change the language of a contract or justify an interpretation not reasonably derivable from the contract itself").

█ A written instrument is ambiguous when it is reasonably susceptible of more than one meaning. *Cheyenne Mountain,* 861 P.2d at 715; *see Dorman v. Petrol Aspen, Inc.,* 914 P.2d 909, 912 (Colo.1996).

█ "In deciding whether a contract is ambiguous, a court 'may consider extrinsic evidence bearing upon the meaning of the written terms, such as evidence of local usage and of the circumstances surrounding the making of the contract. However, the court may not consider the parties' own extrinsic expression of intent.'" *Cheyenne Mountain,* 861 P.2d at 715 (quoting *KN Energy, Inc. v. Great Western Sugar Co.,* 698 P.2d 769, 777 (Colo.1985)). Mere disagreement between the parties as to the interpretation of a contract does not in itself create an ambiguity as a matter of law. *Ad Two, Inc.,* 9 P.3d at 376–77.

█ Whether an ambiguity exists in an agreement is a question of law subject to de novo review. *Pepcol Mfg. Co. v. Denver Union Corp.,* 687 P.2d 1310, 1314 (Colo.1984).

### A. Completion of a Well

█ Forest Oil contends the trial court erred when it determined the term "completion" as it was used in the Lease was ambiguous. Forest Oil contends that "completion" has a common trade usage meaning "capable or ready to produce gas" which the trial court disregarded in concluding that comple-

tion occurred at the time the drilling rig was released. We agree.

█ "The purpose of an oil and gas lease is to make the mineral estate profitable to both parties through the exploration, development, and production of resources located under the leased premises." *Whitham Farms, LLC v. City of Longmont,* 97 P.3d 135, 137 (Colo.App.2003). When parties are engaged in a trade or technical field, "[u]nless a different intention is manifested ... technical terms and words of art are given their technical meaning when used in a transaction within their technical field." Restatement (Second) of Contracts § 202(3)(b) (1981); *see* David E. Pierce, *Defining the Role of Industry Custom and Usage in Oil & Gas Litigation,* 57 S.M.U. L.Rev. 387, 402 (2004).

Here, the Lease language at issue reads:

Notwithstanding the provisions of this lease to the contrary ... [t]his lease shall not terminate so long as drilling or reworking operations are being continuously prosecuted if not more than 180 days shall lapse between the completion or abandonment of one well and the beginning of operations for the drilling of another well.

The trial court concluded that "[i]n this case, the generally accepted meaning of the term 'completion of a well' is incompatible with express duties of the lessee under the modified 'continuous operations' clause of the lease." We agree with the trial court that the term "completion of a well" has a generally accepted meaning, and thus, we must disagree with the conclusion reached by the court. *See Cheyenne Mountain,* 861 P.2d at 715 (in determining whether a term is ambiguous we look to the language of the contract itself and extrinsic evidence such as trade usage); *Chacon,* 788 P.2d at 750 (courts do not rewrite clear and unambiguous contract provisions).

In this case, the term "completion" is not open to more than one reasonable interpretation, and, therefore, is not ambiguous. It is undisputed from the testimony at trial that the trade usage of the term "completion" in a Producers–88 oil and gas lease is "capable or

ready to produce gas."[7] *See, e.g., Manual of Oil and Gas Terms,* at 174 ("Completion of a well involves those processes necessary before production occurs and after drillers have hit the pay sand, *viz.,* perforating the casing and washing out the drilling mud."); Eugene Kuntz, *A Treatise on the Law of Oil & Gas* § 32.4 (1989) ("As the term 'completion' is used in the drilling clause of an oil and gas lease, it means drilling to the specified depth *and* preparing for the use of various methods of treatment to obtain production of oil or gas ....") (emphasis added); Phillip D. Barber, 9 Colo. Prac. Series, Introduction to Oil & Gas § 2 (2010) (defining the casing point, a point in time concurrent with the releasing of a drilling rig, as "the time when a well has been drilled to the objective depth stated in the initial notice, appropriate tests have been made, and the operator notifies drilling parties of his recommendation with respect to the running and setting of a production string of casing *and completing the well*") (emphasis added); *Illustrated Petroleum Reference Dictionary* 43 (2d ed. 1982) ("[To complete a well is to] finish a well so that it is ready to produce oil or gas. After reaching total depth (TD) casing is run and cemented; casing is perforated opposite the producing zone, tubing is run, and control and flow valves are installed at the wellhead."); *see also Duke v. Sun Oil Co.,* 320 F.2d 853, 859 (5th Cir.) (defining completion of a well in an oil and gas lease as "a well capable of producing gas"), *clarified on r'hrg,* 323 F.2d 518 (5th Cir.1963); *Santa Fe Energy Resources, Inc.,* 138 IBLA 133, 137, 1997 WL 123570, at *4 (Feb. 10, 1997) (construing the phrase "completing of such well" to refer to post-drilling actions undertaken with respect to a producible well).

As the Supreme Court of Oklahoma concluded in 1960:

When used to determine the commencement of a period of time in which an act is to be performed or a right is to be exercised ... the word "completion" means a well drilled to the specified sand or depth, and such means known to the industry have been employed to produce oil "to the extent that a reasonably experienced driller would use" to make a producing well of a non-producing well.

*Edwards v. Hardwick,* 350 P.2d 495, 499–500 (Okla.1960) (quoting *Howard v. Hughes,* 294 Mich. 533, 293 N.W. 740, 743 (1940)); *Howard,* 293 N.W. at 743 ("An oil well is completed when it has been drilled to the oil formation prevailing in that district and ... such means have been employed to produce oil as are known to the industry in that community and ... to the extent that a reasonably experienced driller would use and employ same in good faith effort to make a well an oil producer from a non-producer....").

While the trial court received extensive expert testimony on this matter, it also heard testimony from one of the parties, Robert Bledsoe. Mr. Bledsoe testified that he understood the term "completion" to mean capable or ready to produce gas, but the lease in question changed the meaning of "completion."

DEFENSE COUNSEL: And at the time that you were there discussing it, *you understood, didn't you, that the term "completion of a well" meant that the well had to be ready for production.* That's what it meant in these forms and these leases that you signed before, right?

MR. BLEDSOE: *That is what it meant in the forms,* and we wanted this to be something else. So this is what we negotiated.

. . . .

DEFENSE COUNSEL: And you understood the term "completion" just to be used in its plain English sense, if you will. I mean, the thing had to be done. The drilling, and the perforating, and the tubing, and the fracing, and so forth. You understood that?

MR. BLEDSOE: Except we changed it. *We trumped that in the form with this language here in Exhibit A.*

DEFENSE COUNSEL: Okay. And that's the language here that says, what, that not

___

**7.** It is important to note that this is a special lease form dealing specifically with the lease of land for exploration and development of oil and gas prospects. It is not to be confused with a drilling contract, where the trade usage of the term "completion" may define some earlier point in time, such as the release of a drilling rig.

more than 180 days shall lapse between the completion or abandonment of one well and the beginning of operations for the drilling of another well?

MR. BLEDSOE: That's what it says.

(Emphasis added.)

■ Mr. Bledsoe's testimony that he and Mr. Champion agreed to change the meaning of the term "completion" is not reflected in the unambiguous language of the Lease and thus is extrinsic parol evidence which is contrary to an express term of the contract and barred from consideration. *See Ad Two, Inc.,* 9 P.3d at 376 (the intent of the parties to a contract is to be determined primarily from the language of the instrument itself); *Cheyenne Mountain,* 861 P.2d at 715 (contract language is construed in harmony with the plain and generally accepted meaning of the words employed, and a court may not consider a party's own extrinsic expression of intent); *see also Fort Lyon Canal Co.,* 167 P.3d at 729 (extrinsic evidence cannot justify an interpretation not reasonably derivable from the contract itself).

While the term "completion" can be, by mutual assent of the parties, redefined to mean something other than "capable or ready to produce gas," in reviewing the language of the Lease de novo, we discern no such manifestation by the parties to this Lease. *See* Restatement (Second) of Contracts § 202(3)(b) ("technical terms and words of art are given their technical meaning when used in a transaction within their technical field"). Indeed, there is nothing in the Lease which would lead a reasonable person to think the term "completion" means anything other than its plain English meaning. The Bledsoes' position that they "changed" the word "completion" to mean "releasing the drilling rig" in Exhibit A, while the word "drilling" itself remained unchanged in that same sentence, is unavailing. If the Bledsoes were focused on release of the drilling rig as the date on which the period to drill a new well began, the Lease should have read "not more than 180 days

shall lapse between *the drilling* or abandonment of one well and the beginning of operations for the drilling of another well" rather than "the completion or abandonment of one well." Had the parties intended to impart a special meaning to the term "completion," they were free to do so in the language of Exhibit A. In fact, no such revision was made.

Furthermore, the record indicates that the Bledsoes were not neophytes in dealing with real property issues and oil and gas leases.[8] *Garman v. Conoco, Inc.,* 886 P.2d 652, 660 (Colo.1994) ("Before one can be bound by industry custom 'he must know of it or it must be so universal and well-established that he is presumed to have knowledge of its existence.' ") (quoting *Pittman v. Larson Distrib. Co.,* 724 P.2d 1379, 1384–85 (Colo. App.1986)); Restatement (Second) of Contracts § 202(3)(b). Undeniably, Mr. Bledsoe entered into at least five other Producers–88 form leases prior to the execution of this Lease, and he acknowledged in his testimony he understood the term "completion" to mean "ready to produce." Again, we note that while Mr. Bledsoe insisted that he and Mr. Champion "trumped" this common meaning, it is impossible to come to that conclusion looking at the language of the Lease.

In addition, paragraph 13 of the Lease contains the following provision:

> All express or implied covenants of this lease shall be subject to all Federal and State Laws, Executive Orders, Rules or *Regulations,* and this lease shall not be terminated, in whole or in part, nor Lessee held liable in damages, for failure to comply therewith, if compliance is prevented by, or if such failure is the result of, any such Law, Order, Rule or Regulation.

(Emphasis added.) The Colorado Oil and Gas Conservation Commission (COGCC), by regulation provides, "A gas well shall be considered completed when the well is capable of producing gas through wellhead equipment from the ultimate producing zone after

---

**8.** For example, Robert Bledsoe is an investor in several oil and gas exploration partnerships, has been the chairman of the Yuma County Planning Commission, and has purchased mineral rights for the Ranch. The Bledsoes have leased portions of the Ranch forty times since the 1970s and have been able to demand higher prices per acre and in royalties due to the size of the Ranch.

the production string has been run." 2 Code Colo. Regs. 404–1:100. Thus, because we read contracts in their entirety, *see Fibreglas Fabricators*, 799 P.2d at 374, we conclude the Lease is subject to the COGCC regulations and its definition of "completion." Again, parties are always free to change the meaning of a term in a contract, but they must manifest their intent to do so in the contract itself.

Thus, because we conclude the term "completion" is not ambiguous as a matter of law, the trial court erred in its interpretation of the Lease. The undisputed testimony at trial established that Forest Oil did not complete Well # 10–6–5–44 until it was hydraulically fractured on August 9, 2007, and, therefore, only 176 days passed between completion of Well # 10–6–5–44 and commencement of Well # 8–3–5–45. Accordingly, Forest Oil did not violate the 180–day provision of the Lease.[9]

### B. Continuous Prosecution

■ Additionally, Forest Oil contends the trial court erred in its interpretation of the term "continuously prosecuted" as used in the Lease. We agree.

■ Contract language "must be examined and construed in harmony with the plain and generally accepted meaning of the words used, and reference must be made to *all* the agreement's provisions." *Fibreglas Fabricators, Inc.*, 799 P.2d at 374 (emphasis added); *see Ad Two, Inc.*, 9 P.3d at 376.

Here, the Lease clearly defines the term "continuously prosecuted" in paragraph 1 of the Producers–88 form.

[O]perations shall be considered to be continuously prosecuted if not more than ninety (90) days shall elapse between the completion or abandonment of one well and the beginning of operations for the drilling of a subsequent well.

When this provision is read in harmony with the additional language in Exhibit A, it is clear that the only change made to the definition is the time frame in which a lessee had to "continuously prosecute" a well.

In its judgment, the trial court concluded:

This provision can only be interpreted to mean that at the end of the primary term, the lease would not terminate so long as drilling or reworking operations were being continuously prosecuted *and* not more than 180 days elapsed between the completion or abandonment of one well and the beginning of operations for the drilling of the next well.

(Emphasis added.) However, no "and" is present in the Lease. Indeed, the Lease clearly states, "This lease shall not terminate so long as drilling or reworking operations are being continuously prosecuted *if* not more than 180 days shall lapse between the completion or abandonment of one well and the beginning of operations for the drilling of another well." (Emphasis added.)

■ The trial court's conclusion that "continuously prosecuted" as used in Exhibit A meant "continuous, uninterrupted and nonstop" would require a wholesale change in the definition from one provision in the Lease to another, without any such expression or intent being evidenced in the Lease. It is paramount in contract interpretation that we read a contract's terms in harmony and give effect to all the contract's provisions. *See Pepcol Mfg. Co.*, 687 P.2d at 1313 ("An integrated contract in the first instance is to be interpreted in its entirety with the end in view of seeking to harmonize and to give effect to all provisions so that none will be rendered meaningless."); *see also Fibreglas Fabricators*, 799 P.2d at 374.

Furthermore, the trial court's interpretation of the Lease as requiring continuous work on a well in essence renders meaningless the 180–day provision in Exhibit A. Should Forest Oil have to continuously drill or rework its wells on a daily basis, as the

---

9. At oral argument, the Bledsoes' counsel contended that if completion is the date that a well is capable or ready to produce gas, a lessee could theoretically drill a well to target depth, put in the casing and release the rig, then wait months before completing the well, effectively nullifying any continuous operations provision. In contrast to counsel's speculation, we note that the evidence at trial showed that Forest Oil rarely waited more than seven days between releasing a drilling rig and completing a well.

trial court interpreted, it would be unnecessary for the 180–day provision to exist. The record indicates that both parties agree the 180–day provision defines a period of inactivity as opposed to activity. Indeed, in the complaint and throughout trial, the Bledsoes asserted that Forest Oil breached the Lease because "more than 180 days had elapsed" between completion or abandonment of one well and beginning of operations for a subsequent well. It would be unnecessary for the Bledsoes to take this position had they believed that the Lease required Forest Oil's drilling and reworking to be "continuous, uninterrupted and nonstop."

Because the Lease defines the term "continuously prosecuted" as drilling a new well every 180 days, the trial court erred in concluding that Forest Oil breached the Lease by failing to drill or rework wells on a continuous basis. Consequently, Forest Oil did not breach the Lease and reversal is required.

### III. Remaining Contentions

Forest Oil also appeals the trial court's grant of costs and attorney fees to the Bledsoes under section 38–42–105. On cross-appeal the Bledsoes contest the trial court's denial of additional damages under section 38–42–105 and request appellate attorney fees. In light of our conclusions above, we need not address these contentions.

The judgment is reversed.

Judge BERNARD and Judge FOX concur.