20CA0346 First Transit v Colorado Springs 10-21-2021 COLORADO COURT OF APPEALS Court of Appeals No. 20CA0346 El Paso County District Court No. 12CV81 Honorable Eric Bentley, Judge First Transit, Inc., Third Party Plaintiff-Appellant and Cross-Appellee, v. City of Colorado Springs, Colorado, Third Party Defendant-Appellee and Cross-Appellant. JUDGMENT AFFIRMED Division III Opinion by JUDGE BROWN Furman and Lipinsky, JJ., concur NOT PUBLISHED PURSUANT TO C.A.R. 35(e) Announced October 21, 2021 Littler Mendelson, P.C., Darren E. Nadel, Stephen E. Baumann II, David Gartenberg, Denver, Colorado, for Third Party Plaintiff-Appellant and Cross-
Appellee Wynetta P. Massey, City Attorney, Ryan D. Doherty, Assistant City Attorney, Colorado Springs, Colorado; Sparks Willson, P.C., Eric V. Hall, Colorado Springs, Colorado, for Third Party Defendant-Appellee and Cross-Appellant 
1 ¶ 1 In this contract dispute, third-party plaintiff, First Transit, Inc. (First Transit), appeals the district court’s order entering summary judgment in favor of third-party defendant, City of Colorado Springs (City). The City cross-appeals the court’s order denying summary judgment in its favor on an alternative ground. We agree with the City that it was entitled to summary judgment on the alternative ground, which obviates the need to resolve First Transit’s contentions. Thus, we affirm the entry of summary judgment in favor of the City. I. Background A. The UMTA ¶ 2 In 1964, Congress enacted the Urban Mass Transportation Act (UMTA), 49 U.S.C. § 5333, to allow governmental entities to seek federal funds to improve or acquire public mass-transit systems. City of Colorado Springs v. Solis, 589 F.3d 1121, 1124 (10th Cir. 2009). In response to concerns that the provision of federal funds would be used to destroy the collective-bargaining rights of unionized transit workers, Congress included section 13(c) in the UMTA, which “sets forth minimal standards that a [governmental] transit authority must satisfy before it may receive federal funding.” 
2 Id. at 1125 (quoting Burke v. Utah Transit Auth., 462 F.3d 1253, 1258 (10th Cir. 2006)); see also § 5333(b). ¶ 3 To that end, section 13(c) of the UMTA makes the protection of employees’ interests under “protective arrangements” a condition of financial assistance. § 5333(b)(1). Among other things, the protective arrangements must include provisions necessary for “the protection of individual employees against a worsening of their positions related to employment.” § 5333(b)(2)(C). Agreements entered into between governmental bodies and unions to satisfy section 13(c) are commonly called “13(c) agreements.” Solis, 589 F.3d at 1125. B. The 13(c) Agreement ¶ 4 In 1981, the City applied for federal funds under the UMTA to assist in purchasing assets for its mass transit system. To facilitate its receipt of federal funds, and as required by section 13(c) of the UMTA, the City entered into a section 13(c) agreement (the 13(c) Agreement) with Amalgamated Transit Union, Local 19 (ATU). ¶ 5 As relevant here, paragraph seven of the 13(c) Agreement required the City to pay a “dismissal allowance” to “any employee 
3 laid off or otherwise deprived of employment as a result of the Project.” ¶ 6 The “Project” is defined in the first recital and in paragraph one of the 13(c) Agreement. The first recital states that the City filed an application under the UMTA “for capital assistance to assist in the purchase of buses and other transit related facilities, as more fully described in the project application (‘Project’).” ¶ 7 Paragraph one of the 13(c) Agreement states that “[t]he term ‘Project’ as used in this agreement shall not be limited to the particular facility, service, or operation assisted by federal funds, but shall include any changes, whether organizational, operational, technological, or otherwise, which are a result of the assistance provided.” Paragraph one also states: The phrase “as a result of the Project” shall, when used in this agreement, include events occurring in anticipation of, during, and subsequent to the Project and any program of efficiencies or economies related thereto; provided, however, that volume rises and falls of business, or changes in volume and character of employment brought about by causes other than the Project (including any economies or efficiencies unrelated to the Project) are not within the purview of this agreement. 
4 C. South Services Contract ¶ 8 For decades, the City operated a mass transit system, which included the Mountain Metro Transit system (commonly known as the South Facility) and the Pikes Peak Regional Transit Authority system (commonly known as the North Facility). Since at least 1981, the City received federal funds for the acquisition of assets for and operation of both the South Facility and the North Facility. ¶ 9 In 2006, the City awarded First Transit1 a contract to operate a fixed route bus service out of the South Facility (the South Services Contract). The 13(c) Agreement (and a model 13(c) agreement with identical terms) were attached to and specifically incorporated into the South Services Contract when it was executed. The 13(c) Agreement provided that any entity undertaking the management or operation of the mass transit system “shall agree to be bound by the terms of this agreement and accept the responsibility for full performance of these conditions.” 1 The original contract was entered between Laidlaw Transit Services, Inc., and the City. In 2009, Laidlaw merged into First Transit and dissolved. First Transit succeeded to the rights and interests of Laidlaw under the South Services Contract. 
5 ¶ 10 Section 7.29 of the South Services Contract, titled “13(c) Requirements,” provides as follows: 1. Federal projects funded through Federal Transit Administration grants are subject to 13(c) (49 U.S.C. Section 5333(b)) employee protective arrangements. The current City 13(c) agreements are attached to this Contract and the terms and conditions of the agreements flow down to [First Transit] and are included in the scope of the Contract. [First Transit] agrees to be bound by and to perform the obligations of the City’s March 1981 13(c) Agreement and the Model 13(c) Agreement. These obligations include, but are not limited to, the 13(c)(1) and 13(c)(2) requirements to preserve collective bargaining rights in accordance with applicable law. The City and [First Transit] agree that the obligations required under this section 7.29 are limited to the performance of [First Transit’s] obligations under this Contract for the term of this Contract. 2. The City shall be responsible for any 13(c) costs, claims, losses and/or liability resulting from any City actions, including any changes requested, mandated or otherwise approved in writing by City. [First Transit] shall be responsible for any 13(c) costs, claims, losses and/or liability resulting from any [First Transit] actions during the term of this Agreement that are not requested, mandated or otherwise approved in writing by City. 
6 3. [First Transit] shall not negotiate or agree to any labor agreement which extends beyond the term of this Contract. [First Transit] agrees not to accept or enter into any labor agreement under this Contract without prior written approval of the terms and conditions of any such agreement. Any labor benefits negotiated between [First Transit] and [First Transit’s] employees or [First Transit] employee representatives which result in costs in excess of the City’s appropriated funds shall be the sole responsibility of [First Transit]. D. Cessation of South Facility Operations ¶ 11 In 2009, the City notified First Transit “of the cessation of the Operation of General Fund Fixed Route Services on December 31, 2009.” The notice explained that, “[d]ue to significant sales tax funding shortfalls projected for 2010, the City of Colorado Springs is unable to provide funding for the [South Services] [C]ontract.” The City terminated the South Services Contract effective December 31, 2009, and directed First Transit “to plan the cessation of your operations accordingly.” ¶ 12 First Transit ceased its operations under the South Services Contract after December 31, 2009, and terminated the employment of all South Facility employees effective January 1, 2010. 
7 Seventy-four bus drivers, mechanics, and other employees — all of whom were members of ATU — lost their jobs when First Transit ceased South Facility operations. II. Procedural History ¶ 13 In January 2010, ATU sent First Transit a letter asserting that its members whose employment was terminated because of the South Services Contract cancellation “are entitled to dismissal allowances pursuant to Paragraph (7) of the [13(c)] Agreement.” In July 2010, ATU filed a complaint against First Transit seeking an order to compel arbitration of “claims made by ATU against First Transit arising under the 13(c) Agreement.” The court ordered ATU and First Transit to arbitrate ATU’s claims.2 ¶ 14 In September 2010, First Transit filed a third-party complaint against the City. First Transit asserted a single claim for “Enforcement of Contract For Indemnification.” It alleged that ATU’s claims were “the direct and necessary result of the City’s 2 Paragraph 15(a) of the 13(c) Agreement provided that, “in the event of any labor dispute involving [First Transit] and the employees covered by this agreement which cannot be settled within thirty (30) days . . . such dispute may be submitted at the written request of either [ATU] or [First Transit] to a board of arbitration . . . .” 
8 action . . . terminating the South Services Contract and mandating the closure of the South Facility and termination of the South Facility employees.” And it alleged that the City was “contractually obligated to assume sole responsibility, indemnify and compensate First Transit[] for any and all costs and liability resulting from the ATU’s claims raised pursuant to the Section 13(c) Agreement.” ¶ 15 In May 2013, First Transit and the City filed a stipulated motion to stay proceedings on the third-party claim “until the claims between First Transit and ATU are resolved.” In support of the motion, the parties explained that “the ATU must still establish First Transit’s liability under the Section 13(c) Agreement in arbitration. Accordingly, First Transit’s claim for indemnity is anticipatory, in that its own liability must first be established before its interest in seeking declaration of an indemnity obligation ripens.” The court granted the motion and stayed proceedings on the third-party complaint. ¶ 16 ATU and First Transit never arbitrated ATU’s claim. Instead, they settled in December 2017. ATU agreed to release its claims and First Transit agreed to pay ATU $1 million. 
9 ¶ 17 In February 2019, the district court lifted the stay and permitted First Transit to amend its third-party complaint against the City to assert an alternative claim for subrogation. It alleged that “the City is primarily liable to ATU under the Section 13(c) Agreement and the South Services Contract,” so “First Transit’s payment to ATU is solely that of a subrogee that steps into the shoes of the City for purposes of the City’s debt to ATU.” ¶ 18 In November 2019, the City and First Transit cross-moved for summary judgment. First Transit argued that (1) the City was contractually obligated to indemnify it for its costs and liability resulting from ATU’s claim; (2) the City was obligated to subrogate First Transit for its costs, liability, and expenses resulting from ATU’s claim; and (3) it was entitled to summary judgment on the amount of liability because the ATU settlement was reasonable. ¶ 19 The City argued, among other things, that (1) its obligation to indemnify First Transit under section 7.29(2) of the South Services Contract was never triggered because the termination of the employment of ATU’s members was not “as a result of the Project”; and (2) even if its indemnity obligation had been triggered, section 7.5 of the South Services Contract, which subjects the City’s 
10 obligations under the South Services Contract to annual appropriation, would bar recovery. ¶ 20 The district court held a hearing on the motions in January 2020. After the hearing, the district court granted the City’s motion and denied First Transit’s. ¶ 21 The court rejected the City’s argument that its obligation under section 7.29(2) was never triggered. The court explained that “ATU brought a ‘13(c) claim’ — that is, a claim under the Section 13(c) Agreement — against First Transit in response to the layoffs of its members at the South Facility.” It noted that it had previously concluded that First Transit was bound by the 13(c) Agreement when it compelled First Transit to arbitrate ATU’s claim under the 13(c) Agreement. And it explained that there was “substantial evidence that First Transit incurred ‘losses’ and ‘liability’ as a result of ATU’s 13(c) claim: it was forced to defend ATU’s lawsuit, and ultimately settled the lawsuit for $1 million.” Accordingly, the court denied summary judgment “on the City’s contention that [section 7.29 of the South Services Contract] was never triggered.” 
11 ¶ 22 However, the court still entered summary judgment in the City’s favor based on section 7.5(a) of the South Services Contract, which provides, in relevant part: In accord with the Colorado Constitution and City Charter, performance of the City’s obligations under this Contract is expressly subject to appropriation of funds by the City Council. Further, in the event that funds are not appropriated in whole or in part sufficient for performance of the City’s obligations under this Contract . . . then the City may terminate this Contract without compensation to the Contractor. ¶ 23 The court explained that section 7.5(a) incorporates the Taxpayer Bill of Rights (TABOR), which requires voter approval before creation of any “multiple-fiscal year direct or indirect district debt or other financial obligation whatsoever without adequate present cash reserves pledged irrevocably and held for payments in all future fiscal years.” Colo. Const. art. X, § 20(4)(b). In light of TABOR, the court concluded that section 7.5(a) “means the City must be free in any given year to elect not to renew the Contract, and it must be free to do so without a financial consequence of the sort prohibited by TABOR.” Holding the City liable under section 7.29(2), the court reasoned, would run counter to section 7.5(a) and 
12 TABOR because it would (1) make section 7.29(2) legally enforceable against the City in future years and (2) require the City to appropriate money and pay the obligation in future years. III. Analysis ¶ 24 On appeal, First Transit contends that the district court erred by concluding that (1) the City’s purported failure to allocate funds for the South Services Contract “nullified” section 7.29(2) and (2) TABOR “invalidates” section 7.29(2) of the South Services Contract. On cross-appeal, the City argues that the district court properly entered summary judgment on the ground that section 7.5(a) of the South Services Contract foreclosed First Transit’s indemnification claim, but it contends the court erred by denying summary judgment on the ground that its obligation to indemnify First Transit under section 7.29(2) was never triggered. ¶ 25 Because First Transit’s appellate arguments are premised on it being entitled to indemnity (or subrogation) under section 7.29(2) in the first instance, we resolve the City’s cross-appeal first. We conclude that the City had no obligation under section 7.29(2) to indemnify or subrogate First Transit for the liability it incurred in connection with ATU’s claim. Consequently, we need not reach the 
13 issues First Transit raises regarding whether another provision of the contract or TABOR relieved City of that obligation. A. Standard of Review ¶ 26 We review both the grant of summary judgment and questions of contract interpretation de novo. Ad Two, Inc. v. City & Cnty. of Denver, 9 P.3d 373, 376 (Colo. 2000) (contract interpretation); Montoya v. Connolly’s Towing, Inc., 216 P.3d 98, 103 (Colo. App. 2008) (summary judgment order). ¶ 27 Summary judgment is appropriate when the pleadings, affidavits, depositions, and admissions establish that there is no genuine issue of material fact and that the moving party is entitled to judgment as a matter of law. C.R.C.P. 56(c); BA Mortg., LLC v. Quail Creek Condo. Ass’n, 192 P.3d 447, 450 (Colo. App. 2008). We afford all favorable inferences that may be drawn from the undisputed facts to the nonmoving party, and we resolve all doubts as to the existence of a triable issue of fact against the moving party. Cotter Corp. v. Am. Empire Surplus Lines Ins. Co., 90 P.3d 814, 819 (Colo. 2004). ¶ 28 The party moving for summary judgment bears the initial burden of demonstrating that there is no genuine issue of material 
14 fact. Cont’l Air Lines, Inc. v. Keenan, 731 P.2d 708, 712 (Colo. 1987). Once the moving party has met this initial burden, the burden shifts to the nonmoving party to establish a genuine issue of material fact. Id. If the nonmoving party cannot produce sufficient evidence to make out a triable issue of fact, a trial would be useless, and the moving party is entitled to summary judgment as a matter of law. Id. at 713. B. Principles of Contract Interpretation ¶ 29 We construe an indemnity agreement in accordance with the same principles that govern the interpretation of contracts generally. Lafarge N. Am., Inc. v. K.E.C.I. Colo., Inc., 250 P.3d 682, 685 (Colo. App. 2010). ¶ 30 The primary goal of contract interpretation is to determine and give effect to the intent of the parties. Ad Two, 9 P.3d at 376. In determining the parties’ intent, we look primarily to the language of the instrument itself. Id. And when several documents or contracts are “part of a single transaction, they should be read together as a whole, not in isolation, to determine the parties’ intent.” Bledsoe Land Co. LLLP v. Forest Oil Corp., 277 P.3d 838, 842 (Colo. App. 2011). 
15 C. Under the Plain Language of the Parties’ Agreement, the City Does Not Have an Obligation to Indemnify First Transit for the Amount it Paid ATU to Settle ATU’s Claim ¶ 31 Section 7.29(2) of the South Services Contract is titled “13(c) Requirements” and provides that the City “shall be responsible for any 13(c) costs, claims, losses and/or liability resulting from any City actions, including any changes requested, mandated or otherwise approved in writing by the City.” Throughout the litigation, the parties appeared to agree that the phrase “[t]he City shall be responsible for” means the City agreed to indemnify First Transit.3 Under the plain language of the provision, however, the City is only obligated to indemnify First Transit if (1) there is a 13(c) cost, claim, loss, or liability, (2) resulting from any City actions. ¶ 32 The undisputed evidence presented on summary judgment is that First Transit laid off members of ATU because the City terminated the South Services Contract. The layoffs caused ATU to 3 In response to a question at oral arguments, counsel for First Transit indicated that section 7.29(2) was not an indemnity provision but instead created an obligation that the City subrogate First Transit for amounts First Transit paid ATU, which is why First Transit amended its third-party complaint against the City to include a claim for subrogation. We address First Transit’s subrogation claim in Part III.E. 
16 assert a claim against First Transit for “dismissal allowances” under the 13(c) Agreement. First Transit paid ATU $1 million in settlement of ATU’s claim. Thus, it is undisputed that, if a 13(c) cost, claim, loss, or liability exists, it resulted from a City action. ¶ 33 But the parties dispute whether First Transit’s claim for reimbursement of the $1 million it paid to ATU in settlement of ATU’s claim (and any associated litigation costs or attorney fees) constitutes a 13(c) cost, claim, loss, or liability. To resolve this dispute, we look to the plain language of the parties’ agreement. Ad Two, 9 P.3d at 376. ¶ 34 Section 7.29(1) of the South Services Contract expressly references the 13(c) Agreement, notes that the 13(c) Agreement is attached, explains that “the terms and conditions of the [13(c) Agreement] flow down to [First Transit] and are included in the scope of the [South Services] Contract,” and provides that First Transit “agrees to be bound by and to perform the obligations of the [13(c) Agreement] and the Model 13(c) Agreement.” Indeed, both the 13(c) Agreement and an identically worded model 13(c) agreement are attached to the South Services Contract. Because the South Services Contract unambiguously incorporates the 13(c) Agreement, 
17 we read these documents together to determine the intent of the parties. Id. ¶ 35 We also note that “13(c)” is an adjective that modifies each of the following successive nouns: “costs, claims, losses and/or liability.” See People v. Lovato, 2014 COA 113, ¶ 24 (“[T]he first adjective in a series of nouns or phrases modifies each noun or phrase in the following series unless another adjective appears.”). So, we read section 7.29(2) as making the City “responsible for” 13(c) costs, 13(c) claims, 13(c) losses, or 13(c) liabilities. ¶ 36 Given the express incorporation of the 13(c) Agreement into section 7.29 of the South Services Contract, and based on the plain language of section 7.29(2), it is clear the parties intended the phrase “13(c) costs, claims, losses and/or liability” to mean any costs, claims, losses, or liabilities owed under the 13(c) Agreement. ¶ 37 In its claim against First Transit, ATU asserted that its members were entitled to “dismissal allowances” under the 13(c) Agreement. Under the 13(c) Agreement, however, an employee is only entitled to a dismissal allowance if they are “deprived of employment as a result of the Project.” (Emphasis added.) The 13(c) Agreement defines the Project as the City’s request “for capital 
18 assistance to assist in the purchase of buses and other transit related facilities, as more fully described in the project application,” and is not “limited to the particular facility, service, or operation assisted by federal funds, but shall include any changes, whether organizational, operational, technological, or otherwise, which are a result of the assistance provided.” (Emphasis added.) Further, the phrase “as a result of the Project” includes “events occurring in anticipation of, during, and subsequent to the Project and any program of efficiencies or economies related thereto” but expressly excludes “volume rises and falls of business, or changes in volume and character of employment brought about by causes other than the Project (including any economies or efficiencies unrelated to the Project).” ¶ 38 The undisputed evidence presented on summary judgment showed that the City’s termination of the South Services Contract was due to an economic downturn and resulting budget crisis, not due to its expenditure of federal funds. In other words, it is undisputed that ATU’s members were not laid off “as a result of the Project” and, therefore, were not entitled to dismissal allowances under the 13(c) Agreement. Because ATU’s members were not 
19 entitled to dismissal allowances under the 13(c) Agreement, First Transit’s settlement payment to ATU does not constitute a 13(c) cost, claim, loss, or liability for which the City is “responsible” under section 7.29(2) of the South Services Contract. D. First Transit’s Characterization of its Claim as a “13(c) Claim” Does Not Alter the City’s Indemnification Obligation ¶ 39 First Transit does not appear to dispute that ATU’s members were not, in fact, entitled to dismissal allowances under the 13(c) Agreement. Instead, it contends that, because ATU asserted a claim arising under the 13(c) Agreement, it does not have to establish it actually owed ATU’s members dismissal allowances under the 13(c) Agreement. In other words, First Transit contends that the City has the obligation to indemnify it for the $1 million settlement payment merely because ATU asserted a “13(c) claim”; it does not matter whether the claim was valid or whether First Transit had any legal liability to ATU under the 13(c) Agreement. First Transit’s argument, however, ignores the distinction under Colorado law between a duty to indemnify and a duty to defend. ¶ 40 The duty to defend is separate and distinct from the duty to indemnify. Cyprus Amax Mins. Co. v. Lexington Ins. Co., 74 P.3d 
20 294, 299 (Colo. 2003). The duty to defend pertains to an indemnitor’s duty to affirmatively defend against pending claims. See Const. Assoc. v. N.H. Ins. Co., 930 P.2d 556, 563 (Colo. 1996). In contrast, the duty to indemnify relates to the indemnitor’s duty to satisfy a judgment entered against the indemnitee. See id. ¶ 41 “[T]he duty to defend arises where the alleged facts even potentially fall within the scope of coverage, but the duty to indemnify does not arise unless the [contract] actually covers the alleged harm.” Id. Thus, the determination of whether indemnity is ultimately required “is a question of fact” that “typically cannot be determined until the resolution of the underlying claims.” Cyprus, 74 P.3d at 301. Indeed, “the trigger for the duty to indemnify must normally await a determination of actual liability” because “indemnity flows from the nature of the ultimate verdict, judgment or settlement.” Id. ¶ 42 In resolving indemnity disputes, a trial court should look to how the underlying claims are stated, but “that cannot be the end of the inquiry.” Id. Rather, the trial court must “look to the facts as they developed at trial and the ultimate judgment.” Id. When the “claims do not proceed through the crucible of trial, and instead are 
21 settled by the parties, the analysis becomes more difficult” and the court may look to extrinsic evidence to determine “whether and to what extent actual liability, as represented by a verdict or settlement, is covered” by an indemnity agreement. Id. at 301-02. ¶ 43 Here, although First Transit and ATU settled their dispute, the underlying undisputed facts make clear that the actual liability First Transit incurred was not covered by the indemnity agreement reflected in section 7.29(2). The City terminated the South Services Contract because of an economic downturn, so the ATU members who were laid off did not lose their jobs “as a result of the Project.” If ATU’s members did not lose their jobs “as a result of the Project,” they were not entitled to dismissal allowances under the 13(c) Agreement. If ATU’s members were not entitled to dismissal allowances under the 13(c) Agreement, the amount First Transit paid ATU to settle its claim is not a liability for which the City is responsible. ¶ 44 If the City had a duty to defend First Transit under section 7.29(2) of the South Services Contract, our analysis would be different. Then, the mere fact that ATU asserted a “13(c) claim” against First Transit may have triggered the City’s duty to defend. 
22 But First Transit does not contend that the City has a duty to defend under section 7.29(2) of the South Services Contract, nor did it demand the City defend it against ATU’s claims. ¶ 45 In support of its argument that its actual liability to ATU under the 13(c) Agreement is irrelevant, First Transit primarily relies on Missouri Pacific Railroad Co. v. Kansas Gas & Electric Co., 862 F.2d 796 (10th Cir. 1988), and Burlington Northern Railroad Co. v. Stone Container Corp., 934 P.2d 902 (Colo. App. 1997). Both cases are distinguishable. ¶ 46 In Missouri Pacific, a utility company agreed to maintain safe working conditions along railroad tracks running into a construction site, including clearing the tracks of any obstruction, in return for the furnishing of rail service to the premises. 862 F.2d at 797. The agreement stated that the utility company shall assume “full responsibility for, and shall defend, indemnify and save harmless” the railroad company from “any and all” liability, suits, claims, damages, and losses caused by a breach of the utility company. Id. (emphasis added). ¶ 47 It was undisputed that the utility company obstructed the rail track and caused injury to a railroad employee. Id. at 798. The 
23 employee sued the railroad company under the Federal Employer’s Liability Act (FELA), which provides that a railroad has the nondelegable duty to provide its employees with a safe place to work even when they are required to go onto the premises of a third party over which the railroad has no control. Id. at 797. The railroad demanded the utility company participate in negotiations to resolve the employee’s claim. Id. at 798. ¶ 48 The utility company denied liability and refused to assume the defense of the employee’s claim. Id. The railroad settled with its employee and sought indemnity from the utility company. Id. The utility company sought to avoid liability by claiming that the railroad’s settlement with the employee was not reasonable. Id. at 800. In rejecting the utility company’s position, the Tenth Circuit explained that, “[w]here an indemnitor denies liability and refuses to assume the defense of a claim under a contract of indemnity, the indemnitee, without waiving its rights, may enter into a good faith, reasonable and prudent settlement with the claimant.” Id. (emphasis added). It further explained that “[p]roof of absolute legal liability or the actual amount of damages is not necessary in a subsequent action for recovery against the indemnitor.” Id. 
24 ¶ 49 In Burlington, a landowner purchased industrial property serviced by a railroad and was obligated not to place any material or obstruction within a certain distance of the train track. 934 P.2d at 903. The landowner agreed to “indemnify [the railroad] and save it harmless from and against any and all claims, demands, expenses, costs and judgments arising or growing out of . . . injury . . . occurring directly or indirectly by reason of any breach” of that obligation. Id. at 905. It was undisputed that a railroad employee was injured when he tripped over a board within the prohibited area. Id. at 904. The employee sued the railroad under the FELA and invited the landowner to participate in settlement negotiations. Id. The landowner refused to participate, and the employee and railroad company settled. Id. ¶ 50 Citing Missouri Pacific, the division in Burlington explained the “process for determining the liability of an indemnitor when a single claim against the indemnitee has been settled.” Id. at 906. It used similar language as the Tenth Circuit, rejecting the contention that the indemnitee must “prove absolute legal liability, the actual amount of damages, or even the specific amount of a reasonable settlement.” Id. Rather, like the Tenth Circuit, the division 
25 concluded that “the indemnitee need only prove that it was potentially liable to the claimant and that the settlement amount was reasonably related to the liability exposure and the employee’s injuries.” Id. Thus, it reasoned, “to encourage indemnitors to honor their contractual obligations, as well as to encourage the settlement of claims covered by the indemnity agreements, an indemnitee need only prove that the underlying claim was settled with the third party in good faith and reasonably.” Id. at 907. ¶ 51 First Transit relies on Missouri Pacific and Burlington to argue that it need not prove its “absolute legal liability” to ATU in order to be indemnified by the City; instead, it need only prove its “potential liability” and that the settlement amount is reasonably related to the 13(c) Agreement. See Burlington, 934 P.2d at 907. But Missouri Pacific and Burlington are distinguishable in at least three important ways. ¶ 52 First, when the Tenth Circuit in Missouri Pacific discussed the railroad’s need to prove only its “potential liability,” the discussion was clearly in the context of the FELA, which unquestionably does not apply in this case. Mo. Pac., 862 F.2d at 800. The Tenth Circuit explained that “the indemnitee ‘need only prove its potential 
26 liability, a relatively simple showing under the strict FELA standards, and that the settlement amount was reasonably related to its employee’s injuries.” Id. (first emphasis added). Burlington also involved a FELA claim. 934 P.2d at 904. ¶ 53 Second, the events triggering the indemnity obligations in Missouri Pacific and Burlington indisputably occurred. In Missouri Pacific, the utility company “constructed a temporary crossing over the rail with dirt and rock in violation of” its agreement with the railroad. 862 F.2d at 798. In Burlington, the employee was injured after tripping over a board within a certain distance of the tracks, which the landowner was obligated to keep clear. 934 P.2d at 903-04. Here, in contrast, the event triggering indemnity — a payment due under the 13(c) Agreement — indisputably did not occur. As a division of this court explained in Lafarge, nothing in Burlington “indicates that the indemnitee need not prove that the act of the indemnitor triggering the indemnitor’s liability occurred if, as here, such an act is indeed required.” 250 P.3d at 688. ¶ 54 Third, and most important, the indemnitors in Missouri Pacific and Burlington were subject to very broad indemnity agreements, which included a duty to defend the railroad. Mo. Pac., 862 F.2d at 
27 797 (utility company “shall defend, indemnify and save harmless” the railroad); Burlington, 934 P.2d at 906 (“If the indemnitor denies liability and refuses to assume the defense of the claim,” the indemnitee “may enter into a good faith, reasonable settlement with the claimant.”) (emphasis added). As explained above, the duty to defend is much broader than the duty to indemnify and is triggered by the nature of the claim itself without regard to the ultimate liability. Here, the City had only the duty to indemnify. Thus, First Transit had to prove that its actual liability fell within the scope of the indemnity agreement. Cyprus, 74 P.3d at 301-02. It failed to do so. ¶ 55 Thus, we reject First Transit’s argument that it need only show its “potential liability” to ATU to be entitled to indemnity under section 7.29(2) of the South Services Contract. E. First Transit’s Claim for Subrogation Fails ¶ 56 Finally, First Transit contends the City was obligated to subrogate First Transit for its costs, liability, and expenses resulting from ATU’s claim. Although it is unclear to us whether the district court resolved this claim, we nonetheless conclude that First Transit did not assert a valid subrogation claim. 
28 ¶ 57 Subrogation is “the substitution of another person in the place of a creditor, so that the person in whose favor it is exercised succeeds to the rights of the creditor in relation to the debt.” Cotter Corp., 90 P.3d at 833 (quoting Behlen Mfg. Co. v. First Nat’l Bank of Englewood, 28 Colo. App. 300, 309, 472 P.2d 703, 707 (1970)). Subrogation therefore allows a party who discharges another’s debt to “stand in the shoes” of the subrogor. Id. at 834. ¶ 58 But First Transit has not discharged the debt of another and does not seek payment from a liable third party. For First Transit (the subrogee) to have a subrogation claim against the City (the third party), ATU (the subrogor) must have had a claim against the City that First Transit discharged. But ATU asserted its claim against First Transit, which is the party responsible under the 13(c) Agreement and the South Services Contract for addressing employee claims under the 13(c) Agreement. And by paying ATU $1 million, First Transit discharged its own obligation, not the City’s. ¶ 59 First Transit’s claim against the City seeks reimbursement from the City, from whom it has a direct contractual right of repayment. Id. A claim for reimbursement is distinct from a claim 
29 for subrogation; subrogation does not provide a remedy to a party seeking to recover its own expenses. Id. Under the circumstances, First Transit has no claim for subrogation. ¶ 60 In the end, we conclude that the district court erred by denying the City summary judgment on the ground that the City did not have the obligation to indemnify or subrogate First Transit for its settlement payment to ATU under section 7.29(2) of the South Services Contract, so we affirm the entry of summary judgment on this alternative ground. See W. Colo. Cong. v. Umetco Mins. Corp., 919 P.2d 887, 892 (Colo. App. 1996) (appellate courts may affirm on grounds different from those of the trial court). Because of our disposition, we need not address whether TABOR or section 7.5 of the South Services Contract relieved the City of any liability it had under section 7.29(2). IV. Conclusion ¶ 61 We affirm the district court’s entry of judgment in favor of the City. JUDGE FURMAN and JUDGE LIPINSKY concur.